COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges Beales, O'Brien, AtLee, Malveaux, Athey, Causey,
                Friedman, Chaney, Raphael, Lorish, Callins, White, Frucci and Bernhard
Argued at Richmond, Virginia


MONICA DRASOVEAN

                                                                                  OPINION BY
v.        Record No. 0259-23-4                            JUDGE DOMINIQUE A. CALLINS
                                                                                  JULY 15, 2025
STEVEN WALTS, ET AL.


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Carroll A. Weimer, Jr., Judge

Benjamin F. North (Binnall Law Group, PLLC, on briefs), for
appellant.

John F. Cafferky (Ian J. McElhaney; Blankingship & Keith, P.C., on
brief), for appellees.


Monica Drasovean sued three employees (the "appellees") of the Prince William County

School Board (the "School Board") in their official capacities, alleging that they were grossly

negligent in approving the transfer of a student to her high school whom Drasovean alleged

sexually assaulted her while in class together.  The circuit court granted the appellees' plea in bar

on the grounds that Drasovean's suit against them in their official capacities amounted to a suit

against the School Board itself, which enjoys absolute sovereign immunity in tort under Virginia

law.  On appeal, a divided three-judge panel of this Court reversed the circuit court's judgment,

holding that school board employees sued in their official capacities are not entitled to sovereign

immunity from gross negligence claims.  *Drasovean v. Walts*, No. 0259-23-4, slip op. at 27-28

(Va. Ct. App. Nov. 6, 2024).  Upon the appellees' petition for rehearing en banc, we affirm the

circuit court's judgment.

BACKGROUND[1]

During the 2016-2017 school year, Drasovean was a student at C.D. Hylton High School ("Hylton") in Prince William County and was enrolled in the Special Education Program due to having intellectual disabilities. At that time, Dr. Steven Walts was the Superintendent of Prince William County Public Schools ("PWCS"), Dr. Michelle Roper was the Director of Special Education for PWCS, and David Cassady was Hylton's principal.

Around November 2016, a new student (the "Student") was transferred into Hylton's Special Needs Program, whom Drasovean alleged had "a known troubled record involving harmful, sexual, and abusive behavior towards other children." Before the transfer was complete, the head of Hylton's Special Needs Education Department raised concerns to Cassady from a Hylton teacher that the Student "would not be a good fit for the special needs program at Hylton and would pose a danger to other students." Cassady contacted Dr. Roper about the Student's transfer, and the two ultimately approved the transfer, basing their decision in part "upon criteria promulgated by the Prince William County School Board and [Dr. Walts]."

Upon arriving at Hylton, the Student was placed in several classes with Drasovean that were supervised by teachers, and at least one class had a teacher and a teacher's aide. Drasovean alleged that, from November 2016 to January 2017, the Student repeatedly sexually assaulted her by touching her breasts and legs, kissing her, and "trying to take her outside of the school building to perform other sexual acts on her." Drasovean alleged that many of these assaults occurred in open view in her classrooms consisting of only four students, "yet the assaults were not recognized by the teachers." In January 2017, Drasovean told her mother about the assaults,

---

[1] "[W]here no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented. In doing so, the facts stated in the plaintiff's [complaint] are deemed true." *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 301 Va. 305, 312 (2022) (second alteration in original) (quoting *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019)).

who then reported the assaults to Hylton and the police. The Student was eventually transferred to another school in March 2017.

In January 2019, Drasovean filed her first complaint in the circuit court against the appellees, as well as against the Virginia Board of Education and the School Board, asserting a claim of simple negligence and gross negligence, as well as federal violations of 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act. Drasovean's action was removed to the United States District Court for the Eastern District of Virginia, where her federal claims were dismissed, and her state law negligence claims were remanded to the circuit court. The circuit court sustained the appellees' demurrers to Drasovean's simple negligence claim but granted her leave to amend her gross negligence claim. Drasovean filed an amended complaint asserting one count of gross negligence against the appellees and the Virginia Board of Education, although she nonsuited the action in March 2021. Drasovean finally filed the current action in September 2021, asserting one count of gross negligence against the appellees in their official capacities.

In response, the appellees filed a plea in bar asserting that Drasovean's gross negligence claim was barred under sovereign immunity because her claim against them in their official capacities was functionally against the School Board itself, which enjoys absolute sovereign immunity from tort suits in Virginia. After a hearing, the circuit court sustained the plea in bar and dismissed the case with prejudice, agreeing with the appellees that Drasovean's suit against them in their official capacities was tantamount to a suit against the School Board itself, which enjoys absolute sovereign immunity in tort. Drasovean then appealed to this Court.

A divided panel of this Court reversed the circuit court's judgment and remanded the case for further proceedings. *Drasovean*, slip op. at 28. The panel majority agreed with the appellees that Drasovean's suit against them in their official capacities amounted to a suit against the

- 3 -

School Board itself, but nevertheless held that the School Board was not entitled to sovereign immunity from Drasovean's gross negligence claim. *Id.* at 20-21, 27. In reaching this holding, the panel majority applied the Fourth Circuit's test for determining whether a state entity is entitled to sovereign immunity in federal court under the Eleventh Amendment[2] and concluded that "the school board should be treated as a municipal corporation rather than an arm of the State." *Id.* at 16-17. Then, applying the Virginia law principle that municipal corporations acting in a proprietary capacity are not immune from tort liability, the panel majority concluded that "where, as here, the underlying claim is based upon individual actors or actions rather than policy or other governmentally necessary duties, a school board's 'actions' should be considered proprietary." *Id.* at 23. Having concluded that the School Board is a municipal corporation that acted in a proprietary capacity in approving the Student's transfer to Hylton, the panel majority ultimately held that school boards do not enjoy absolute sovereign immunity from tort suits in Virginia. *Id.* at 27.

The dissenting judge agreed with the majority's conclusion that Drasovean's suit against the appellees in their official capacities was functionally a suit against the School Board itself, but disagreed with the majority's holding that the School Board could not claim sovereign immunity from Drasovean's gross negligence claim. *Id.* at 29-30 (Callins, J., dissenting). Citing *Kellam v. School Board of the City of Norfolk*, 202 Va. 252 (1960), the dissenting judge concluded that "the school board as an arm of the Commonwealth enjoys absolute sovereign immunity," and thus the dissenting judge would have affirmed the circuit court's judgment. *Id.* at 30-31.

The appellees petitioned for en banc review of the panel decision, raising the sole issue of whether the panel majority erred in holding that school boards do not enjoy absolute sovereign

_____

[2] *Drewrey v. Portsmouth City Sch. Bd.*, 264 F. Supp. 3d 724, 727 (E.D. Va. 2017).

immunity from tort suits in Virginia.  We granted the appellees' petition as to that issue.  *See* Rule 5A:35(b)(1).

ANALYSIS

"The existence of sovereign immunity is a question of law that is reviewed de novo." *City of Chesapeake v. Cunningham*, 268 Va. 624, 633 (2004).  Under the common law doctrine of sovereign immunity, "[n]o action for tort may be brought against the Commonwealth unless it consents, or a statute exists that grants the necessary consent."  *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 301 Va. 305, 313 (2022) (citations omitted).  There are two primary circumstances in which an entity that is not the Commonwealth itself nevertheless partakes in the Commonwealth's sovereign immunity.  First, "[t]he General Assembly can create a separate entity as an agency of the Commonwealth to perform a function of state government and that entity will also be clothed with the Commonwealth's immunity."  *Id.*  Second, "[s]overeign immunity protects municipalities from tort liability arising from the exercise of governmental functions," although "[t]here is no municipal immunity . . . in the exercise of proprietary functions."  *Cunningham*, 268 Va. at 634.  If an entity falls into either of these two categories, then it enjoys the Commonwealth's sovereign immunity in tort.  Reaching this determination is governed purely under Virginia law.  *See Fines*, 301 Va. at 319 ("[S]tate law governs the applicability of immunity to state law claims." (alteration in original) (quoting *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998))).

At the outset, it must be observed that there is no dispute in this case that a suit against a government employee in his or her official capacity is functionally a suit against the government entity that the employee works for.  This principle has been generally recognized by our Supreme Court and the United States Supreme Court.  *See, e.g.*, *Hinchey v. Ogden*, 226 Va. 234, 238 (1983) ("[The government employee], sued in his official status, enjoys whatever immunity

the sovereign may be entitled to claim."); *Suffolk City Sch. Bd. v. Wahlstrom*, 302 Va. 188, 221 (2023) (explaining that "'official capacity' and 'individual capacity' . . . [are] terms of art as it pertains to suits against government officials and are neither interchangeable nor synonymous" and that "different procedures and immunity rules " apply to each); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))). Since Drasovean's suit against the appellees in their official capacities amounted to a suit against the School Board itself, the only question at issue is whether school boards themselves partake in the Commonwealth's sovereign immunity in tort.

In *Kellam*, our Supreme Court answered "yes" to that question. The Court held that a school board, as an agency of the Commonwealth performing a governmental function, was immune from liability for a tort claim alleging that the school board negligently maintained aisles during a concert in a school auditorium. 202 Va. at 253-54. In reaching this conclusion, the Court maintained that "[t]he basis for a school board's immunity from liability for tortious injury has been generally found in the fact that it is a governmental agency or arm of the state and acts in a governmental capacity in the performance of its duties imposed by law." *Id.* at 254. The Court reasoned that the creation of school boards is mandated by the Virginia Constitution and that "[p]ursuant to these mandates, the legislature has established school boards to act as agencies of the State in carrying out the obligations imposed." *Id.* Consistent with *Kellam*, the Virginia Constitution currently mandates that "[t]he General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth" and that "[t]he supervision of schools in each school division shall be vested in

a school board." Va. Const. art. VIII, §§ 1, 7.[3] The appellees here, in making the discretionary decision to approve the Student's transfer to Hylton's Special Needs Program, were clearly performing a supervisory, governmental function of the School Board pursuant to this constitutional mandate.

After *Kellam*, the Court has consistently reiterated the principle that school boards are agencies of the Commonwealth that enjoy the Commonwealth's sovereign immunity in tort. *See, e.g.*, *Maddox v. Commonwealth*, 267 Va. 657, 665 (2004) ("[A] school board is an agent or instrumentality of the state, not a true municipality, and therefore 'partakes of the state's sovereignty with respect to tort liability.'" (quoting *Kellam*, 202 Va. at 259)); *Linhart v. Lawson*, 261 Va. 30, 36 (2001) ("As a general matter, school boards are immune governmental entities." (citing *Kellam*, 202 Va. at 256)). Indeed, the Court recently confirmed in *Newport News School Board v. Z.M.*, ___ Va. ___, ___ (May 8, 2025), that "[s]chool boards are covered by sovereign immunity." *Id.* at ___ (citing *Kellam*). Rejecting a plaintiff's argument that school boards are not immune from gross negligence claims in Virginia, the Court maintained that "[a]lthough government *employees* are not immune from claims of gross negligence, the School Board itself benefits from immunity from suit, whether the claims involve simple negligence, gross negligence, or even intentional torts." *Id.* at ___ (citation omitted).

CONCLUSION

Under *Kellam*, Virginia school boards continue to partake in the Commonwealth's sovereign immunity in tort. Since Drasovean's suit against the appellees in their official capacities was functionally a suit against the School Board itself, her gross negligence claim was

---

[3] The Virginia Code likewise provides that "[t]here shall be a system of free public elementary and secondary schools . . . administered by the Board of Education, the Superintendent of Public Instruction, division superintendents and school boards" and that "[t]he supervision of schools in each school division shall be vested in a school board." Code §§ 22.1-2, -28.

barred under sovereign immunity.  Accordingly, the circuit court's judgment sustaining the appellees' plea in bar is affirmed.

*Affirmed.*

Raphael, J., with whom Lorish, J., joins, concurring.

The result in this case is dictated by our Supreme Court's recent decision in *Newport News School Board v. Z.M.*, ___ Va. ___ (May 8, 2025). *Z.M.* squarely held that "School boards are covered by sovereign immunity." *Id.* at ___ (citing *Kellam v. Sch. Bd. of the City of Norfolk*, 202 Va. 252 (1960)). The Court unanimously rejected the argument that school boards are somehow "not immune when it comes to claims of gross negligence." *Id.* at ___. The Court left no doubt about its holding: "Although government *employees* are not immune from claims of gross negligence, the School Board itself benefits from immunity from suit, *whether the claims involve simple negligence, gross negligence, or even intentional torts*." *Id.* at ___ (second emphasis added) (citation omitted). I therefore join the majority opinion in full.

I write separately to make two points. First, our legal history explains why school boards enjoy absolute tort immunity when cities, towns, and other municipal corporations do not. Our precedent treats school boards—like counties—as arms of the State for sovereign-immunity purposes. Second, federal precedent on the scope of immunity under the Eleventh Amendment does not determine the scope of sovereign immunity in tort under Virginia law.

*A. School boards enjoy the same sovereign immunity as counties.*

"[T]he Commonwealth and its agencies are immune from liability for the tortious acts of their agents, employees, and servants absent express statutory or constitutional provisions waiving immunity." *Maddox v. Commonwealth*, 267 Va. 657, 661 (2004). But the immunity of the Commonwealth and its various political subdivisions differs according to the entity in question. While the Commonwealth itself started with broad common-law tort immunity, "[t]he General Assembly provided an express, limited waiver of the Commonwealth's immunity in 1981 by enacting the Virginia Tort Claims Act." *Id.* That waiver, however, does not apply to tort claims against:

- 9 -

- State agencies, *see Rector & Visitors of the Univ. of Va. v. Carter*, 267 Va. 242, 244 (2004);

- school boards, *see* Code § 8.01-195.2; or

- counties, cities, and towns, *see* Code § 8.01-195.3.

In Virginia, cities and towns are considered "municipalities." *See* Code §§ 1-224, 15.2-102. They enjoy common-law sovereign immunity from tort claims only if the conduct giving rising to the claim arose out of a "governmental" function, not a "proprietary" function. *Page v. Portsmouth Redev. & Hous. Auth.*, ___ Va. ___, ___ (July 3, 2024); *Patterson v. City of Danville*, 301 Va. 181, 189 (2022) (same). "A municipality engages in a governmental function when it exercises powers and duties exclusively for the public welfare, effectively acting 'as an agency of the state to enable it to better govern that portion of its people residing within its corporate limits.'" *Patterson*, 301 Va. at 189 (quoting *Hoggard v. City of Richmond*, 172 Va. 145, 147 (1939)). "In contrast, proprietary functions generally involve nondiscretionary duties such as those imposed by the common law on private parties." *Page*, ___ Va. at ___.

Counties, on the other hand, enjoy sovereign immunity in tort *regardless* of whether the underlying conduct was governmental or proprietary in nature. As our Supreme Court explained 135 years ago, "[t]he rules established by the courts concerning municipal corporations have but slight application to counties organized as ours are. Our counties are parts of the state, political subdivisions of the state, created by the sovereign power for the exercise of the functions of local government." *Fry v. Cnty. of Albemarle*, 86 Va. 195, 197 (1890). The Court has repeatedly restated that principle in modern times. *See Massenburg v. City of Petersburg*, 298 Va. 212, 217-18 (2019) ("Unlike counties, which share fully in the sovereign's immunity from tort, whether a municipal corporation is entitled to sovereign immunity protection depends on the type of function it exercises when liability arises." (citations omitted)); *Seabolt v. Cnty. of Albemarle*, 283 Va. 717, 719 (2012) ("Counties, as political subdivisions of the Commonwealth,

enjoy the same tort immunity as does the sovereign."); *Lentz v. Morris*, 236 Va. 78, 82 (1988) (stating that a county "shares the immunity of the State"); *Messina v. Burden*, 228 Va. 301, 313 (1984) (same).

*Fry* explained that we treat counties like the Commonwealth for sovereign-immunity purposes because counties operate as arms of the State:

> A county organization is created almost exclusively with a view to the policy of the State at large, for purposes of political organization and civil administration, in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and of transport, and especially for the general administration of justice.
>
> With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the State, *and are in fact but a branch of the general* administration of that policy.

86 Va. at 197 (quoting *Bd. of Comm'rs v. Mighels*, 7 Ohio St. 109, 119 (1857)). Cities, towns, and other municipal corporations, by contrast, stand on a different foundation. As the Court summarized nearly a century ago:

> There is a fundamental distinction between municipal corporations and county organizations. . . . Counties are local subdivisions of a State, created by the sovereign power of the State, of its own sovereign will, without the particular solicitation, consent, or concurrent action of the people who inhabit them. The former organization is asked for, or at least assented to by the people it embraces; the latter is superimposed by a sovereign and paramount authority.

*Smith v. Kelley*, 162 Va. 645, 649 (1934).

Virginia caselaw since then has refined the distinction between (1) counties and State agencies and (2) local governmental entities that require "local activation[] [that is] optional with each locality." *See Fines v. Rappahannock Area Cmty. Servs. Bd.*, 301 Va. 305, 313 (2022) (second alteration in original) (quoting *Va. Elec. & Power Co. v. Hampton Redev. & Hous. Auth.*, 217 Va. 30, 32-33 (1976)). "[W]hen participating localities retain 'substantial local control' over

- 11 -

an entity they have created, local activation negates its status as a state agency or an 'arm' of the Commonwealth." *Cnty. of York v. Peninsula Airport Comm'n*, 235 Va. 477, 481 n.1 (1988) (quoting *Prendergast v. Park Auth.*, 227 Va. 190, 194 (1984)).

It is sometimes unclear whether some local governmental entities should be treated like a city or town for sovereign-immunity purposes. *E.g.*, *Fines*, 301 Va. at 315 (community services board); *Va. Elec. & Power Co.*, 217 Va. at 33 (housing authority). In those instances, our Supreme Court has set forth a two-factor test. "The first factor requires courts to look at 'how many attributes of a municipal corporation . . . the entity . . . possess[es].'" *Fines*, 301 Va. at 315-16. The Court "has identified six attributes that are 'pertinent to a determination that a particular entity occupies the status of a municipal corporation.'" *Id.* at 316 (quoting *Va. Elec. & Power Co.*, 217 Va. at 33).[4] "The second factor asks, 'in the light of this initial consideration, what is the particular purpose for which it is sought to determine whether or not a municipal

---

[4] The six attributes are:

> (1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;
>
> (2) Creation to serve a public purpose;
>
> (3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenues, personal and real property;
>
> (4) Possession of the power of eminent domain;
>
> (5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state;
>
> (6) Management of the corporation vested in a board of directors or a commission.

*Fines*, 301 Va. at 316 (quoting *City of Richmond v. Richmond Metro. Auth.*, 210 Va. 645, 647 (1970)).

corporation is present?'" *Id.* (quoting *Hampton Roads Sanitation Dist. Comm'n v. Smith*, 193 Va. 371, 376 (1952)).

Where do school boards fit in this dichotomy between counties and municipal corporations? The principal dissent would treat a school board no differently from a municipal corporation that sometimes exercises governmental functions. But the Supreme Court made clear in *Kellam* that school boards, like counties, are arms of the State, not municipal corporations: "The basis for a school board's immunity from liability for tortious injury has been generally found in the fact that it is *a governmental agency or arm of the state and acts in a governmental capacity* in the performance of its duties imposed by law." 202 Va. at 255 (emphasis added). The Court eschewed the governmental-proprietary distinction, referring to the school board as "a quasi corporation, *all of whose functions were purely governmental*." *Id.* at 258 (emphasis added).

In support of that arm-of-the-state characterization, *Kellam* pointed to two provisions in the 1928 Constitution, *id.* at 259 (citing Va. Const. §§ 129, 133 (1928)), which were carried forward respectively in Article VIII, §§ 1 and 7 of our current Constitution. Article VIII, § 1 requires the General Assembly to "provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth." Article VIII, § 7 provides that "[t]he supervision of schools in each school division shall be vested in a school board." Under such constitutional "mandates, the legislature has established school boards to act as agencies of the State in carrying out the obligations imposed." *Kellam*, 202 Va. at 255. In other words, school boards "are but the agents of the State, for the sole purpose of administering the state system of public education." *Id.* at 255-56 (quoting *Krutili v. Bd. of Educ.*, 129 S.E. 486, 487 (W. Va. 1925)).

Contrary to Drasovean's suggestion that *Kellam* is no longer good law, the Supreme Court has repeatedly said since *Kellam* that school boards partake of the State's immunity in tort and are *not* municipal corporations. *See, e.g.*, *Maddox*, 267 Va. at 665 ("[A] school board is an agent or instrumentality of the state, not a true municipality, and therefore '"partakes of the state's sovereignty with respect to tort liability."'" (quoting *Kellam*, 202 Va. at 259)); *Taylor v. City of Charlottesville*, 240 Va. 367, 374 (1990) ("[*Kellam*] emphasized that school boards, being state agencies, differed from true municipal corporations."). *Z.M.*, of course, now reaffirms that.

In short, school boards enjoy the same broad immunity in tort as counties. A school board is an "organization . . . created almost exclusively with a view to the policy of the State at large, for purposes of political organization and civil administration . . . in matters of . . . education." *Fry*, 86 Va. at 197. Like a county—and unlike a municipal corporation such as a community services board or housing authority—a school board does not depend for its creation on "local activation" that is "optional with each locality." *Fines*, 301 Va. at 313. Rather, school boards are created in each school division by Article VIII, § 7 of the Constitution and its implementing statute, Code § 22.1-28. School boards were created as arms of the State to carry out a critical State function: the education of the Commonwealth's children.

As a result, school boards, like counties, enjoy the full spectrum of immunity described in *Z.M.*, shielding them from liability for the torts of school employees regardless of whether the wrongful conduct involved "simple negligence, gross negligence, or even intentional torts." ___ Va. at ___; *accord Kellam*, 202 Va. at 259 ("[T]he right to recover should not be determined by the gradation of negligence or by the adjectives used in the complaint." (quoting *Bingham v. Bd. of Educ.*, 223 P.2d 432, 436 (Utah 1950))).

- 14 -

*B. Eleventh Amendment caselaw does not determine Virginia tort immunity.*

Drasovean and the principal dissent mistakenly rely on federal caselaw construing the Eleventh Amendment to determine the scope of a school board's liability under Virginia law for the torts of its employees. Eleventh Amendment precedent cannot be transplanted that way.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The amendment was swiftly enacted to abrogate *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), where the Supreme Court had entertained a suit by a citizen of South Carolina against the State of Georgia. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 720-21, 724 (1999) (recounting history); *Patterson*, 301 Va. at 188 (same). State sovereign immunity was considered so important at the founding that "[t]he Constitution never would have been ratified if the States and their courts were to be stripped of their sovereign authority except as expressly provided by the Constitution itself." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239 n.2 (1985). Although the text of the Eleventh Amendment speaks to a suit by a citizen of one State against another State (as in *Chisholm*), the Supreme Court has consistently held that the immunity of States from suit was "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the Convention or certain constitutional Amendments." *Alden*, 527 U.S. at 728. "'Eleventh Amendment immunity' . . . is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment."[5] *Id.* at 713.

---

[5] The Supreme Court has recognized several instances in which the States have surrendered their immunity from suit in the "'"plan of the Convention"'" as part of "'the structure of the original Constitution itself.'"" *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 584-85

In the Eleventh Amendment context, the Supreme Court has consistently held that "municipalities, unlike States, do not enjoy a constitutionally protected immunity from suit." *Jinks v. Richland Cnty.*, 538 U.S. 456, 466 (2003); *see, e.g.*, *Lake Country Est., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'"). So even when "Congress lacks authority . . . to override a *State's* immunity from suit . . . , it may subject a *municipality* to suit . . . if that is done pursuant to a valid exercise of its enumerated powers." *Jinks*, 538 U.S. at 465-66.

When distinguishing between States and municipalities, however, the Supreme Court has used the term "municipality" generically compared to its term-of-art meaning under Virginia law. As shown above, a city or town is a "municipality" under Virginia law; a county is not. *See* Code §§ 1-224 (defining "municipality" and "municipal corporation" to "mean cities and towns"), 15.2-102 (same); *Smith*, 162 Va. at 649 ("There is a fundamental distinction between municipal corporations and county organizations."). Eleventh Amendment precedent does not follow that distinction, denying immunity "to *counties and similar* municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (emphasis added); *see also Lincoln Cnty. v. Luning*, 133 U.S. 529, 530 (1890) ("[W]hile the county is territorially a part

_____

(2022) (quoting *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 500 (2021)). States agreed to be amenable to suit by other States in an original action in the Supreme Court. *See Principality of Monaco v. Mississippi*, 292 U.S. 313, 328 (1934). They agreed to be sued by the United States in federal court. *See United States v. Texas*, 143 U.S. 621, 644-45 (1892). And although States generally did *not* agree to be sued under statutes enacted pursuant to Congress's Article I powers, *see Alden*, 527 U.S. at 712, the Supreme Court has recognized (at least so far) three exceptions: Congress may override State immunity under its war powers, *Torres*, 597 U.S. at 584; under its federal-eminent-domain power, *PennEast*, 594 U.S. at 488; and under its bankruptcy power, *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 379 (2006). In addition, section 5 of the 14th Amendment empowers Congress to override State immunity "to enforce that Amendment's guarantees." *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727 (2003).

of the State, yet politically it is also a corporation created by and with such powers as are given to it by the State. In this respect it is a part of the State only in that remote sense in which any city, town, or other municipal corporation may be said to be a part of the State.").

As a result, Eleventh Amendment precedent puts local school boards in the same "municipality" category as counties. Thus, the Supreme Court in *Mt. Healthy* denied Eleventh Amendment immunity to a local Ohio school board because it was "more like a county or city than . . . an arm of the State." 429 U.S. at 280-81. The main case on which Drasovean and the principal dissent rely, *Drewrey v. Portsmouth City School Board*, 264 F. Supp. 3d 724 (E.D. Va. 2017), straightforwardly applied those rules to the school board at issue there. *Id.* at 730-71. *Drewrey* acknowledged that Virginia school boards enjoy sovereign immunity from State tort claims under *Kellam*. *Id.* at 730. Still, the school board's immunity in tort did not give it Eleventh Amendment immunity from liability on federal claims. *Id.*

In short, Eleventh Amendment precedent cannot reliably determine the scope of sovereign immunity in tort under Virginia law. Indeed, if Eleventh Amendment caselaw controlled Virginia tort immunity, *no* local governmental entity would have any kind of tort immunity because no such local entity enjoys Eleventh Amendment immunity.

To be sure, Eleventh Amendment immunity and Virginia sovereign immunity share some commonalities. At a high level of generality, both address the immunity of the sovereign from suit. And both treat sovereign immunity as a background principle of the common law that preceded constitutional formation.[6]

---

[6] *Compare Patterson*, 301 Va. at 194 (describing State tort immunity as "indisputably part of the common-law architecture of judicial power"), *with PennEast*, 594 U.S. at 499 ("When 'the States entered the federal system,' they did so 'with their sovereignty intact.'" (quoting *Blatchford v. Native Vill. of Noatak*, 501 U. S. 775, 779 (1991))), *and Alden*, 527 U.S. at 715-16 ("[T]he doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified.").

But the similarities mostly end there. Eleventh Amendment jurisprudence has been developed by the Supreme Court of the United States as a body of federal constitutional law; Virginia's sovereign-immunity law has been developed by our Supreme Court and has been modified from time to time by the General Assembly. *E.g.*, Code §§ 8.01-195.1 to -195.9 (Virginia Tort Claims Act); Code § 22.1-194 (providing for limited waiver of a school board's "defense of governmental immunity" in school-bus-accident cases). As our Supreme Court recently reminded us, "immunity from tort liability involves a matter of *substantive* law," *Fines*, 301 Va. at 320 (emphasis added), meaning *Virginia* law. So it should not surprise anyone that Eleventh Amendment doctrine differs from Virginia's sovereign-immunity law. Different law from different sovereigns is a "defining feature" of "[d]ual sovereignty." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002). When the case, as here, is *not* governed by federal law, "the law to be applied . . . is the law of the State." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

The doctrines of Eleventh Amendment immunity and Virginia sovereign immunity also serve different institutional purposes. Eleventh Amendment immunity developed to protect the sovereignty of the States as constituent members of our federal system. *See, e.g.*, *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity."). Virginia tort immunity, by contrast, reflects how the Commonwealth has chosen to design its "scheme of liability management" for the governmental entities in the vertical hierarchy of State government. *Patterson*, 301 Va. at 194. The General Assembly is free to waive or bestow tort immunity on its agencies and political subdivisions as it sees fit. But it does so from the starting point that the Commonwealth and

arms of the State (including counties and school boards) retain their common-law tort immunity unless and until the General Assembly says otherwise.

* * *

Determining the extent to which governmental entities should be protected from tort liability involves complex policy choices that must balance various competing interests. The interests include compensating injured persons, deterring wrongful conduct, providing for efficient governmental operations, and protecting State and local taxpayers.[7] How to strike that balance is up to the General Assembly. It "is not a debate for Virginia's courts . . . to reset [the] essential doctrinal boundaries [of sovereign immunity] or to replace it with a more adaptive scheme of liability management." *Patterson*, 301 Va. at 194. If liability is to be imposed on an otherwise immune governmental entity, that "should be accomplished through legislative action and not by judicial fiat." *Mann v. Cnty. Bd. of Arlington Cnty.*, 199 Va. 169, 174 (1957).

---

[7] *See, e.g.*, *Z.M.*, ___ Va. at ___ ("'Sovereign immunity is a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities.' 'Most importantly, the doctrine of sovereign immunity provides for "smooth operation of government" and prevents citizens from "improperly influencing the conduct of governmental affairs through the threat or use of vexatious litigation."'" (quoting *City of Va. Beach v. Carmichael Dev. Co.*, 259 Va. 493, 499 (2000))).

Beales, J., concurring only in the judgment.

All the parties before this Court agree that because this case was dismissed by the circuit court on a plea in bar, we must accept as true in our review on appeal all facts alleged in the plaintiff's complaint in the circuit court. *See Montalla, LLC v. Commonwealth*, 303 Va. 150, 164 (2024); *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 301 Va. 305, 312 (2022). In addition, we must also grant the plaintiff the benefit of all reasonable factual inferences that can be drawn from such a view of the facts. *See id.* Therefore, here are the facts that are before this Court (and that were before the circuit court). The plaintiff, Monica Drasovean, was a special needs student in the Special Education Program at C.D. Hylton High School, a public high school in Prince William County, Virginia. Monica was placed on an Individualized Education Plan (IEP) due to her "intellectual disabilities, including deficits in comprehension, processing, memory, sustained attention, visual motor integration, social judgment, and communication." Her IEP was designed to accommodate her specialized needs in her special education classes at Hylton High School.

Monica's teachers, her principal, and presumably the Director of Special Education for Prince William County Public Schools were all aware that given her identified "intellectual and social deficits," Monica was vulnerable and particularly "susceptib[le] to being victimized." However, despite Monica's "known vulnerabilities" as a special needs student, school officials with Prince William County Public Schools nevertheless placed a male high school student with a "known troubled record involving harmful, sexual, and abusive behavior towards other children and students" in the same special education classroom as Monica. This student (who had a history of sexual assaults and sexually abusive behavior toward other students) reportedly "did not have any intellectual disabilities" like Monica, "but rather just poor grades." The school officials—including Superintendent Steven Walts, Director of Special Education Michelle

Roper, and Principal David Cassady, Jr.—inexplicably made this decision to transfer this particular disruptive and sexually abusive male student from another public high school into Monica's special education program and classroom—even after hearing "teacher opposition" that had been voiced "out of concern for the safety of the other students" in the Hylton Special Education Program (which the principal of Hylton High School had conveyed to the central office of Prince William County Public Schools, including at least to Dr. Michelle Roper, the Director of Special Education for all of Prince William County Public Schools).

Nevertheless, the Prince William County Director of Special Education (and the Superintendent) transferred this young man with the history of sexually abusive behavior to Hylton High School anyway—and then placed him in the same special education classroom as Monica. After arriving there, he "repeatedly sexually assaulted Monica" by "touching Monica's breasts, her legs, kissing her, and trying to take her outside of the school building to perform other sexual acts on her" on numerous occasions from November 2016 until January 2017.

According to Monica's complaint, many of these sexual assaults took place "in open view of other people" in a special education classroom at Hylton High—even though "only four students attended the class" and even though a teacher and a teacher's aide were supposed to have been supervising that classroom with only four students. Incredibly, the repeated sexual assaults over numerous weeks supposedly "were not recognized by the teachers" or any supervising authority at the school. Furthermore, despite the perpetrator's "well-known history" of "harmful and sexual behavior and abusive inclinations"—including the report that "he had committed known prior bad acts at another school before his transfer to Hylton"—the principal and the officials with Prince William County Public Schools failed to provide "any additional supervision" of him (or the other students who were already in that special education classroom)

after his arrival (beyond what supervision had already occurred in that classroom before his arrival at Hylton).

After enduring multiple months of repeated sexual assaults by her classmate in her special education classroom during November, December, and January, Monica finally broke down and told her mother about the sexual abuse to which she had been subjected at her school. Monica's mother immediately reported her daughter's sexual abuse to Hylton High School and to the police. The male high school student who was the perpetrator later admitted to the police that he had inappropriately touched Monica, after which he was then transferred to yet another public high school. To cope with the significant trauma that she had experienced at her school, Monica began treatment with a counselor (which is assuredly expensive for her family and which she, "to date, continues going through"). Monica subsequently "was diagnosed with acute stress reaction disorder as a result of her sexual abuse at school."

As articulated by the Virginia Supreme Court in *Kellam v. School Board of the City of Norfolk*, 202 Va. 252, 257-58 (1960), and reiterated just this year by the Supreme Court in *Newport News School. Board v. Z.M.*, ___ Va. ___, ___ (May 8, 2025), *school boards* in Virginia are protected by sovereign immunity. This binding precedent from our Supreme Court makes clear that when a school board is sued as a sovereign entity in state court, "the [s]chool [b]oard itself benefits from immunity from suit, whether the claims involve simple negligence, gross negligence, or even intentional torts." *Z.M.*, ___ Va. at ___. In *Z.M.*, the Court addressed the applicability of Code § 22.1-194—where the General Assembly waived the sovereign immunity of school boards by statute when "a vehicle [is] involved in an accident." *Id.* at ___. In that case (where "school staff" allegedly perpetrated degrading acts on a non-verbal autistic child on a school bus), the Court held that the waiver of sovereign immunity did not apply because the school bus was not a "vehicle involved in an accident." *Id.* at ___, ___. The Court

recognized, however, that while it is true that "sovereign immunity protects the [s]chool [b]oard from suit, the same is not true for the [s]chool [b]oard employees"—such as a school board's chairperson or a school board's director of legal services, both of whom were sued in the *Z.M.* case for their alleged gross negligence. *Id.* at ___. The Supreme Court determined that those employees "are not protected by derivative sovereign immunity in that circumstance" because "government *employees* are not immune from claims of gross negligence." *Id.* at ___ (emphasis in original). *See also James v. Jane*, 221 Va. 43, 53 (1980).

In this appeal now before us, the majority of this Court expressly states that "there is no dispute in this case that a suit against a government employee in his or her official capacity is functionally a suit against the government entity that the employee works for." Indeed, it may be true that when school board members or high-ranking public school officials are sued in their official capacities (and thus as the functional equivalents of the school board itself), those government employees are actually protected by sovereign immunity—even from claims of gross negligence on their part. The majority concludes today that the same is true for the tort claim at issue here—where the plaintiff's counsel filed suit against certain high-ranking public school officials in their official capacities, and which the majority states therefore is barred under sovereign immunity. The obvious question then becomes where can parents and student victims find any accountability from a public school system for its gross negligence and absolute failure to protect its students from repeated sexual assaults (here against one of its most vulnerable students)—even when the school officials had been warned about this perpetrator, who had a history of committing such sexual abuse and previous assaults (all of which occurred *before* what happened in this case to Monica over a period of several months).

The main remedy then left available under the controlling case law governing this Court's decision today could well be in the future to sue such employees in their personal or

individual capacities—rather than in their official capacities. However, this purported "remedy" would undoubtedly give reasonable and decent people serious pause before they would even consider entering public service as an elected school board member—or attempt to rise in the employment ranks of the public education system (either as a principal, assistant principal, superintendent, director of special education, or, for that matter, to serve as a teacher in the classroom). In short, taking such jobs could open these individuals to personal liability for tort claims against them for things that occur in public schools—leaving them wondering whether they could lose their life's savings and even their own homes in such a lawsuit filed against them in their personal capacity.

The judicial branch has definitively spoken now on this important matter—first by the Virginia Supreme Court in *Kellam*, again by the Supreme Court this year in *Z.M.* (although not quite as definitively as in *Kellam*), and now very definitively by the majority of this Court sitting *en banc*. What is also quite clear and well-settled under the separation of powers doctrine is that if the law is to be changed (and if there is to be any accountability for horrible incidents like this one in our public education system), it must be changed by the legislative branch, which writes and makes the law—not by the judicial branch, which interprets and applies the law as written by the legislative branch. *See* Va. Const. art. III, § 1 (mandating the separation of powers).

In short, I write separately today not only to highlight the truly appalling, yet unfortunately not uncommon facts of this case now before the Court but also to emphasize that any changes to the sovereign immunity protections enjoyed by school boards (and by their employees whom this Court has now held are apparently "functional equivalents" of the school boards when sued in their official capacity) must be made by the *legislative branch*—not by the *judicial branch*. For these reasons, I respectfully (if reluctantly) must concur only in the judgment of this Court today, which is interpreting binding Supreme Court precedent—and in

- 24 -

which the Supreme Court itself simply interpreted the statutory and legislative mandates of the

legislative branch that actually makes the laws of the Commonwealth of Virginia.

Causey, J., with whom Athey, Chaney, and Bernhard, JJ. join, dissenting.

According to the complaint, Monica Drasovean, a high school student with intellectual disabilities, was repeatedly sexually assaulted in her high school special education classroom by a student who had a history of abusing other students. The student, in spite of his placement in special education, did not have any intellectual disabilities. Many of these assaults occurred in open view of other people, in a class that numbered only four students. High-ranking school board employees—the Director of Special Education and the principal—had approved the transfer of the offending student to the special education program despite knowing of his history of abuse and despite multiple teachers' expressions of concern. Having placed the student in Drasovean's classes, the employees took no additional precautions to supervise the student or protect Drasovean. The employees' placement decision was based partly on "criteria" established by the School Board Superintendent.

In response, Drasovean brought this suit, seeking to hold three high-ranking school board employees—the Superintendent, the Special Education Director, and the Principal—accountable in their official capacities for acts of gross negligence. In Virginia, school officials have a duty "to supervise and ensure that students could . . . have an education in an atmosphere conducive to learning, free of disruption, and threat to person.'" *Burns v. Gagnon*, 283 Va. 657, 671 (2012) (alteration in original) (internal quotation marks omitted). *See also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (recognizing that "for many purposes 'school authorities act in loco parentis'" (quoting *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986))).

The en banc majority decision affirms the dismissal of Drasovean's suit at the plea in bar stage, prior to discovery or the presentation of any evidence. The majority does so based on two conclusions: first, that the official-capacity suit is equivalent to a suit against the school board itself, and second, that in Virginia, local school boards—unlike cities, towns, housing authorities,

water authorities, county health commissions, park authorities, airport commissions, and, today, under the Virginia Tort Claims Act, the state itself—are absolutely immune from all suits in tort. But there are limits to Virginia's modern common law sovereign immunity doctrine, even applied to school boards themselves. Virginia's local school boards are not absolutely immune from tort liability. Judge Athey's dissent aptly describes the problems with treating the suit as equivalent to a suit against the school board. And school employees cannot be absolutely immune from official-capacity gross negligence suits. Thus, we respectfully dissent.

I: Local School Boards are Local Government Entities under Virginia Law

Local school boards are municipal corporations for sovereign immunity purposes, not "arms of the state." This is a key distinction because municipal corporations are immune only as to their governmental and discretionary functions, not their proprietary and ministerial functions. *Carter v. Chesterfield Cnty. Health Comm'n*, 259 Va. 588, 591 (2000).

The United States District Court for the Eastern District of Virginia recently investigated a nearly identical question. There, the court concluded that Virginia's school boards should be classified as "independent local government agencies" rather than "arms of the state" under Eleventh Amendment sovereign immunity law. *See Drewrey v. Portsmouth City Sch. Bd.*, 264 F. Supp. 3d 724, 730-31 (E.D. Va. 2017); *Drasovean v. Walts*, No. 0259-23-4, slip op. at 16. Appellees argued to the en banc Court that Virginia common law precedent contradicts this analysis. They emphasize *Kellam v. School Board of the City of Norfolk*, 202 Va. 252 (1960), and the standards outlined in *Fines v. Rappahannock Area Community Services Board*, 301 Va. 305 (2022). These cases, as discussed below, support rather than contradict the conclusion reached by the *Drewrey* court and the panel majority in this case.

The trial court erred by dismissing Drasovean's suit at the plea in bar stage. The *Kellam* decision does not render school boards absolutely immune in tort. The trial court was required to

perform an analysis to determine the status of school boards and the type of action they were being sued for—governmental or proprietary, discretionary or ministerial—not simply dismiss the suit as having been brought against employees in their official capacities.

*A: School boards are not arms or agencies of the state.*

*Fines v. Rappahannock,* post-*Kellam*, requires a two-factor test that confirms the Eastern District's holding that Virginia's school boards are not arms or agencies of the state. Accordingly, when an entity claims to be entitled to the Commonwealth's sovereign immunity, "the attributes of the particular entity which seeks immunity must be examined to determine whether it is an 'arm' of the Commonwealth." *Prendergast v. N. Va. Reg'l Park Auth.*, 227 Va. 190, 194 (1984) (citing *VEPCO* v. *Hampton Red. Authority*, 217 Va. 30, 33 (1976)). That test, outlined in *Fines*, is an assessment of two factors: (1) "whether [an] enacting statute 'in and of itself' created the entity and" (2) "whether that entity was subject to substantial state or local control." *Fines*, 301 Va. at 314 (quoting *Prendergast*, 227 Va. at 194). Both factors are required for an entity to constitute an "arm of the state." *See id.* at 315 ("Any doubt regarding this issue [of whether the entity was an arm of the state] is put to rest by the fact that RACSB's ability to act was subject to substantial local, not state, control.").[8]

---

[8] Entities subject to substantial local control must be categorized as local, even if originally created by the state. Many "pure" municipal corporations like towns or cities are created by state legislation. *Roop v. Whitt*, 289 Va. 274, 280 (2015) ("Under the Constitution of Virginia, the General Assembly may create or dissolve localities at will."). Additionally, the *Fines* Court clearly indicated that "municipal corporations" are not limited to locally created entities. *See Fines*, 301 Va. at 311 n.2 ("'[M]unicipal corporation' is a bit of a misnomer. By its plain language, the term implies an entity created by a city or a town. However, this Court has specifically applied a much broader definition to the term . . . .").

- 28 -

School boards may satisfy the first *Fines* factor.[9]  But school boards do not satisfy the second *Fines* factor.  Therefore, school boards are not arms of the state under the *Fines* test because they do not satisfy both required factors.  Beyond requiring their creation, the state of "Virginia exercises little control over its [local] school boards."  *Drewrey*, 264 F. Supp. 3d at 729.  Instead, localities exercise "substantial local control" over school boards.  *See Fines*, 301 Va. at 314.  School board officials are "locally elected and appointed" by local municipal officials or by local voters, not by the governor or any other state official.  *Drewrey*, 264 F. Supp. 3d at 729 (citing Code §§ 22.1-35, -47, -57.3).  *See also* Code § 22.1-76(A).  Local government entities provide significant portions of the funding for their own school districts with revenue raised through taxes on local property.  *Cole v. Buchanan Cnty. Sch. Dist.*, 661 F. Supp. 2d 569, 571 (W.D. Va. 2009) (citing Code § 22.1-95).  Local school boards manage local school systems' funds.  *Drewrey*, 264 F. Supp. 3d at 728.  Local government entities can also approve or veto school boards' applications to borrow money from the state for capital projects and to approve or veto the terms of related agreements.  Code §§ 22.1-161.2 -- -161.3.  Localities, clearly, exercise "substantial local control" over local school boards.  *See VEPCO*, 217 Va. at 32 (considering local powers of appointment and local power over entity's projects among indicators of local control).

"Examin[ing]" the "attributes" of school boards thus reveals that local school boards are not "arms of the state."  *See Prendergast*, 227 Va. at 194.  Therefore, local school boards do not possess the Commonwealth's absolute common law sovereign immunity.

---

[9] The existence of local school boards is required by the Constitution.  Va. Const. art. VIII, § 7; Code § 22.1-25.  School divisions, governed by school boards, come into existence automatically when a new locality is created.  Code § 22.1-25(A)(1).  But the creation of any *new* school division, through consolidation or division of existing school divisions, cannot happen except by the consent of, inter alia, "the governing body of the county or city affected or, if a town comprises the school division, of the town council."  Code § 22.1-25(A)(2).

*B: School boards are municipal corporations under Virginia's sovereign immunity law.*

The next step under the *Fines* analysis requires asking two questions to determine whether an entity is a "municipal corporation" or, instead, "a mere auxiliary of a city or county government." 301 Va. at 316 (quoting *Hampton Roads Sanitation Dist. Comm'n v. Smith*, 193 Va. 371, 377 (1952)). The first question involves determining "'how many [of the following six] attributes of a municipal corporation . . . the entity in dispute possess[es]'":

"(1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;

(2) Creation to serve a public purpose;

(3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenues, persona and real property;

(4) Possession of the power of eminent domain;

(5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions in the state;

(6) Management of the corporation vested in a board of directors or a commission."

*Id.* at 315-16 (first quoting *Smith*, 193 Va. at 374; and then quoting *City of Richmond v. Richmond Metro. Auth.*, 210 Va. 645, 647 (1970)). The second question is whether the Court seeks to determine the entity's status to answer a substantive or procedural question. *Id.* at 316.

School boards in Virginia possess nearly all of the attributes of a municipal corporation under the six-part test in *Fines*. (1) "Every such school board is declared a body corporate." Code § 22.1-71. *See also Drewrey*, 264 F. Supp. 3d at 728. (2) School boards are created to serve a public purpose. (3) School boards "may sue, be sued, contract, be contracted with and, in accordance with the provisions of this title, purchase, take, hold, lease and convey school property, both real and personal." Code § 22.1-71. *See also Drewrey*, 264 F. Supp. 3d at 728. (4) "A school board shall have the power to exercise the right of eminent domain." Code

§ 22.1-127.  (5) "[A]ny school board is . . . authorized to contract to borrow money from the Virginia Retirement System for capital projects for school purposes" and issue bonds for this purpose. Code §§ 22.1-161.1, -161.2, -161.3.  (6) The management of a school board is vested in a board of directors.  Code §§ 22.1-126, -71.  "It is not essential that an entity possess all of these attributes to qualify . . .; rather, [our Supreme Court has] held that an entity may be deemed a municipal corporation 'if it possesses enough of the essential attributes.'"  *Fines*, 301 Va. at 316 (quoting *Cnty. of York v. Peninsula Airport Comm'n*, 235 Va. 477, 481 (1988)).  School boards clearly possess "enough" of those six attributes to constitute municipal corporations.

The final question is whether the purpose for determining the school board's status is substantive or procedural.  *Id.* at 319 (quoting *VEPCO*, 217 Va. at 33).  Sovereign immunity is a substantive law question.  But this factor is not relevant where practically all the attributes of a municipality are present.  *Cf. VEPCO*, 217 Va. at 33-34; *Fines*, 301 Va. at 319.

Overall, the analysis under Virginia's common law tests, like the Eastern District's analysis in *Drewrey*, shows that local school boards are not "arms" or "agencies" of the Commonwealth but municipal corporations for modern sovereign immunity purposes.  School boards' sovereign immunity in tort is therefore not absolute but qualified.

*C: The Kellam decision does not supplant the required analysis of a school board's status.*

Appellees' argument and the en banc majority opinion rely on the 1960 *Kellam* decision.  Even if *Kellam* could be understood to create precedent that school boards were "arms of the state" for the purposes of modern-day sovereign immunity—and, as explained in § I(D), *infra*, it did not—any such precedent was abrogated by the Virginia Tort Claims Act (VTCA).

As amended in 1986, the VTCA specifies that for its purposes, school boards are "not state agencies."  Code § 8.01-195.2.  By its plain text, the "school board" definition in Code

§ 8.01-195.2 is not a fount of absolute immunity. Instead, it clarifies that school boards' immunity claims should be assessed in the manner applicable to municipalities.

In interpreting Code § 8.01-195.2, we "presume that the legislature chose, with care, the words it used when it enacted the relevant statute." *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 277 (2016) (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)). "We are bound by 'the plain language of a statute unless the terms are ambiguous or applying the plain language would lead to an absurd result.'" *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 87 (2021) (quoting *Boynton v. Kilgore*, 271 Va. 220, 227 (2006)). "In keeping with this principle, the court must 'examine a statute in its entirety, rather than by isolating particular words or phrases.'" *Street v. Commonwealth*, 75 Va. App. 298, 306 (2022) (quoting *Schwartz v. Commonwealth*, 45 Va. App. 407, 450 (2005)).

Here, reading the statute in its entirety, the "school board" definition in Code § 8.01-195.2 is not a grant of absolute sovereign immunity. The legislature's definition of "school board" in the VTCA did not *grant* it the Commonwealth's absolute immunity by *denying* that it was the state. Rather, a reasonable interpretation is that the definition *clarified* any ambiguity introduced by language from the *Kellam* decision. The VTCA amendment explicitly clarified that school boards are *not* state agencies for sovereign immunity purposes.

The VTCA generally abrogates the sovereign immunity of *all* governmental agencies in Virginia except certain entities excluded from that waiver. By its plain text, the VTCA provides that "the Commonwealth shall be liable for claims for money" arising from a wrong "caused by the negligent or wrongful act or omission of any *employee* while acting within the scope of his employment under circumstances where the Commonwealth . . . , if a private person, would be liable to the claimant for such damage, loss, injury or death." Code § 8.01-195.3 (emphasis added). The VTCA's waiver of immunity, however, is not tied to the term "state agency."

Rather, it is tied to the definition of "employee." The VTCA defines "[e]mployee" to encompass "*any* officer, employee or agent *of any agency*, or any person acting on behalf of an agency in an official capacity, temporarily or permanently in the service of the Commonwealth, or any transportation district, whether with or without compensation." Code § 8.01-195.2 (emphases added). Further, "agency" is defined as "*any* department, institution, authority, instrumentality, board or other administrative agency of the government of the Commonwealth of Virginia." *Id.* (emphasis added). These definitions of "employee" and "agency," on their own, could be understood very broadly to abrogate the sovereign immunity of lesser "agencies" or subdivisions of the state, such as counties, cities, and towns. *See Botkin v. Commonwealth*, 296 Va. 309, 314 (2018) ("Where used in statutory text, "'[a]ny' is defined, in part, as 'one or some *indiscriminately* of *whatever kind*'; 'one or more indiscriminately from all those of a kind'; or 'one that is selected *without restriction or limitation of choice*.'" (quoting *Any*, *Webster's Third New International Dictionary* (2002))). Therefore, the legislature found it necessary to explicitly exempt certain entities from the scope of the VTCA's abrogation: None of the provisions of the VTCA are "applicable to any county, city or town in the Commonwealth or be so construed as to remove or in any way diminish the sovereign immunity of any county, city or town in the Commonwealth." Code § 8.01-195.3. The result is a system, under the VTCA, in which all government entities *except* counties, cities, and towns have seen their immunity abrogated.

Why would the General Assembly include a specific definition for school boards under Code § 8.01-195.2, considering this text? We would find the answer to that question in Code § 22.1-1 and *Kellam* itself. That section defines "*School board*" as "the school board that governs a school division." Code § 22.1-1 (emphasis added). It also defines the term "Board" or "State Board" as "the *Board of Education*." *Id.* (emphasis added). However, in *Kellam*—as discussed in the following section—the Supreme Court's decision contained language indicating

that local city or county school boards "in maintaining schools, act[] as [agents] for the *state*." *Kellam*, 202 Va. at 255 (emphasis added). Thus, juxtaposing Code § 22.1-1 against the operative holding of *Kellam*, it may be unclear to the court determining whether state or municipal immunity rules apply without more clarification, as there is a State Board of Education and there are city and county boards that operate underneath them. We would find that resolving that potential inconsistency is the exact role that the "school board" definition plays in Code § 8.01-195.2. The VTCA's definitional text does not serve as a disclaimer of sovereign immunity altogether or a fount for absolute immunity—it instead *clarifies* whether state or municipality immunity rules apply to school boards.

A contrary reading of the VTCA would create a significant functional inconsistency: An entity subject to significant, obvious control by localities would receive the Commonwealth's original absolute immunity in tort, despite the Commonwealth itself being deprived of that immunity. Additionally, reading the VTCA as a source of absolute immunity would contravene rules of statutory interpretation. "Like Congress, the General Assembly does not generally 'hide elephants in mouse holes,'" *MAD Props., LLC v. Cnty. of Augusta*, 83 Va. App. 141, 157 (2024) (quoting *NAACP (Hanover Cnty. Chapter) v. Commonwealth ex rel. Va. State Water Control Bd.*, 74 Va. App. 702, 715 (2022)), by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions" beyond their plain text, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Reading this *statutory definition* as evidence that the General Assembly wanted to immunize school boards from all forms of tort liability under the VTCA would turn mere clarifying language into immunizing language. Finally, by denoting in Code § 8.01-195.3 that certain "individual immunity . . . is hereby preserved to the extent and degree that such persons presently are immunized" the General Assembly demonstrated that it understood how to bestow such immunity and how to preserve it. *Cf. Couplin v. Payne*, 270 Va.

129, 135 (2005) (noting in the context of Code § 5.1-173 that "[w]ithout question, the General Assembly knows how to grant immunity to . . . employees, as it clearly did in [Code § 5.1-173(B)]").  But it declined to include school boards and their employees in that list, counseling against any reading that it somehow provided an even stronger form of immunity to school boards.  Code § 8.01-195.2.

The more logical interpretation of the VTCA's definition of school boards is that the legislature intended to clarify that school boards were entitled to the sovereign immunity of municipal corporations.

### D: Kellam does not compel or suggest a contrary result.

Additionally, *Kellam* does not stand in for the modern sovereign immunity analysis. *Kellam* does not mean that school boards are "arms of the state" in the modern sense.  *Kellam* treated school boards similarly to how municipal corporations are treated today.

First, the *Kellam* Court held that a school board was immune from a negligence suit because it was sued for governmental, not proprietary functions.  *See Kellam*, 202 Va. at 256-58 (plaintiff argued that "the School Board . . . was acting in a proprietary capacity," the school board responded that "it was not acting in a proprietary capacity," and the Court "agree[d] with the principles . . . expressed" in an A.L.R. report saying the act was governmental).  It would have made no sense for the *Kellam* Court to limit its holding in this way if school boards possessed the state's absolute sovereign immunity.  *See*, *e.g.*, *William E.S. Flory Small Bus. Dev. Ctr. v. Commonwealth*, 261 Va. 230, 237 n.3 (2001) (The governmental-proprietary analysis "is not applicable to the powers and protections of the state.").

Second, the *Kellam* Court characterized school boards as "public quasi corporations." 202 Va. at 254 (citing, inter alia, 16 M.J. *Schools* § 7).  This meant that while a school board is a corporate body with a public purpose, it lacks the full array of powers available to such "pure"

- 35 -

municipal corporations as self-governing cities and towns.  *See Herald v. Bd. of Educ.*, 65 S.E. 102, 104 (W. Va. 1909) (cited in 16 M.J. *Schools* § 7) ("quasi corporations" distinguished from private corporations and "municipal corporations proper," both of which "are granted a larger measure of corporate life").  Today, such entities are municipal corporations for sovereign immunity purposes when subject to local control.  *See Fines*, 301 Va. at 311 n.2 ("municipal corporation . . . include[s] those *quasi-municipal corporations* which are created to perform an essentially public service" (emphasis added) (quoting *Smith*, 193 Va. at 375)).  *See also Smith*, 193 Va. at 375 (treating "quasi-corporations" as equivalent to "quasi-municipal corporations"); *Krutili v. Bd. of Educ., Butler Dist.*, 129 S.E. 486, 488 (W. Va. 1925) (cited in *Kellam*) (calling school boards "quasi municipal corporations" and "quasi corporations" interchangeably). *Kellam*'s passing use of "arm of the state" did not incorporate today's precedential meaning of that phrase, which did not yet exist.  *See Ashbury v. Norfolk*, 152 Va. 278, 284 (1929) (the only pre-1960 use of "arm of the state," used to distinguish a city's governmental from proprietary functions).  Instead, it reflected the Court's notion of public quasi-corporations.  *See Kellam*, 202 Va. at 259 (such entities perform their governmental functions as state "agents" or "instrumentalities").

Later cases have not turned *Kellam*'s "arm of the state" dicta into absolute immunity precedent.  They have quoted this language only in dicta, never in deciding school boards' immunity as to proprietary or ministerial functions.  *See, e.g.*, *Maddox v. Commonwealth*, 267 Va. 657, 665 (2004) (case in which school board was not a party); *Linhart v. Lawson*, 261 Va. 30, 36 (2001) (citing *Kellam* in the context of school board's immunity for "governmental function" of operating a school bus); *Newport News Sch. Bd. v. Z.M.*, ___ Va. ___, ___ (May 8, 2025) (same).  *Kellam*, therefore, does not replace the modern sovereign immunity analysis.

*E: The sued-on actions were ministerial and thus proprietary, not governmental.*

Because school boards are properly considered municipal corporations for modern sovereign immunity purposes, the final step is to assess whether the school board was sued for discretionary governmental functions or ministerial proprietary functions. *See City of Chesapeake v. Cunningham*, 268 Va. 624, 634 (2004) ("If the function is a ministerial act and involves no discretion, it is proprietary." (citing *Carter*, 259 Va. at 590-91)). The materials before this Court indicate that the school board was sued for ministerial, and thus proprietary, acts.

While a school board exercises discretion in setting policies governing the transfer of students, its employees have no discretion whether to carry out their duties under such policies in a grossly negligent manner. Therefore, the school board is not shielded by sovereign immunity for its employees' grossly negligent actions in (1) placing a student with a known history of abusing other students in a special education classroom and (2) taking zero follow-up precautions to protect a classmate with intellectual disabilities. *See Moss Point Sch. Dist. v. Stennis*, 132 So. 3d 1047, 1050 (Miss. 2014) (recognizing a "ministerial" duty to "take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment"); *J.W. v. Index. Sch. Dist. No. 10*, 500 P.3d 649, 666 (Okla. Civ. App. 2021) (school employees had no discretion in execution of school district's anti-bullying policy); *Dist. Bd. of Trs. of Miami Dade Cmty. Coll. v. M.H.*, 578 So. 2d 8, 8 (Fla. Dist. Ct. App. 1991) (duty to operate a school facility safely, unlike decision to operate the facility at all, was not discretionary). The aspect of the suit regarding the Superintendent's setting of "criteria" governing transfers may be discretionary, but further factual development would help answer this question.

<u>II: Public Employees are Not Immune from Gross Negligence Suits in their Official Capacity</u>

A second reason why the trial court erred in dismissing Drasovean's suit at the plea in bar stage is that allegations of gross negligence against high-ranking school officials in their official capacity cannot be barred by sovereign immunity. Any rule permitting such a bar does a serious injustice to students and their families.

Sovereign immunity "is alive and well in Virginia." *Messina v. Burden*, 228 Va. 301, 307 (1984). But sovereign immunity must have limits to prevent the government from escaping accountability when its employees inflict egregious harms on innocent citizens. *See Husser v. School Dist.*, 228 A.2d 910, 912 (Pa. 1967) (Musmanno, J., dissenting) ("A governmental doctrine which compels corporations and natural persons to bind up the wounds of children struck down through the negligence of corporations and persons but which will itself forget the children languishing in the street where they have been felled by governmental irresponsibility is a doctrine that cannot much longer retain the respect of the legal profession, the legislative department of the state and the general public.").

In addition to those limits previously discussed, one important limitation on sovereign immunity is that generally, sovereign immunity is defeated by claims of gross negligence. *See Colby v. Boyden*, 241 Va. 125, 130 (1991) ("where . . . a defendant's actions are clothed with sovereign immunity, a plaintiff must establish gross negligence in order to prevail" (quoting *James v. Jane*, 221 Va. 43, 53 (1980))). To date, this rule has only clearly been applied in the context of individual capacity suits. *See, e.g.*, *Jane*, 221 Va. at 53. But it should also be applied when public employees are sued in their official capacities, even if such suits are construed to bring in the entity itself. There is no justification for excusing an entity's failure to discourage employees' "*indifference* to [others] and . . . *utter disregard of prudence* that amounts to a *complete neglect of the safety* of [other people]." *Cowan v. Hospice Support Care, Inc.*, 268 Va.

482, 487 (2004) (emphases added) (defining gross negligence).  No entity in a modern society can be excused from ensuring that bare minimum of care.

Acknowledging gross negligence as a limitation on municipal corporations' immunity fits well with Virginia's sovereign immunity doctrine generally.  First, municipal corporations are not fully immune in their governmental functions—they are not immune from nuisance claims. *Maddox*, 267 Va. at 664 (citing *Taylor v. Charlottesville*, 240 Va. 367, 374 (1990)).  Further, while municipal corporations are immune from liability for their employees' intentional torts, *Niese v. City of Alexandria*, 264 Va. 230, 239 (2002), it would be entirely reasonable to distinguish between intentional torts and acts of gross negligence.  Virginia's doctrine of respondeat superior has long made a similar distinction, exempting employers from vicarious liability for torts committed for non-work-related *purposes*.  *Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832, 845 (2019) (quoting *Parker v. Carilion Clinic*, 296 Va. 319, 335 (2018)).  This rule reflects the fact that such employees are not subject to their employers' control.  Restatement (Third) of Agency § 7.07 (A.L.I. 2006).  Gross negligence is not covered by the same rule or justification.

Virginia courts have not held that school board officials are immune from gross negligence suits in their official capacity.  The en banc majority's reliance on *Z.M.* is misplaced for two reasons.  First, that decision turned on the applicability of the special statute provision—Code § 22.1-194—governing school boards' sovereign immunity for school bus accidents.  *See Z.M.*, ___ Va. at ___ ("At issue is whether Code § 22.1-194 waives the Commonwealth's sovereign immunity for [certain] . . . acts alleged to have happened on a school bus, but which do not implicate the operation of the bus as a means of transportation.").  Second, *Z.M.* does not appear to have involved an "official-capacity" suit.  *See id.* at ___.  Finally, the school board's liability in *Z.M.* would have depended on its employees' individual acts of gross negligence, not

related to their official capacities—whereas here, the employees have been sued for acts performed in their official capacities.

Accordingly, *Z.M.* is distinguishable both on legal grounds and factual posture. It should not be read to bar official-capacity claims alleging gross negligence against school board officials where no statute provides otherwise.

Finally, even if official-capacity suits expose the entity to potential liability, it does not necessarily mean that tort-law sovereign immunity applies fully to official-capacity suits. This Court had indicated as much in an unpublished case. *See Bradford v. Crain*, No. 0386-22-2, slip op. at 7, 2023 Va. App. LEXIS 164, at *10 (Mar. 14, 2023) ("A plaintiff must allege gross negligence to overcome sovereign immunity when suing a public official acting in their official capacity."). In the context of official capacity suits against school board employees, it should be held that the entity's full sovereign immunity does not automatically apply to official-capacity suits. School boards, like public employees, enjoy a "slice of State power." *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001) (quoting *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979)). Like public employees, their immunity should be subject to abrogation based on the degree of negligence asserted by the plaintiff. *See Burns*, 283 Va. at 677. For all these reasons, gross negligence should be acknowledged as an exception to school board employees' sovereign immunity from official-capacity suits.

III: Immunizing School Boards Creates Harmful Incentives

Treating school board officials as absolutely immune from official-capacity suits creates harmful incentives for Virginia's citizens and prospective litigants. When families of students harmed by board employees are barred from seeking redress through official-capacity claims, they are left with little choice but to sue individual employees personally. This shift not only deters accountability at the institutional level but also threatens to drive away good teachers,

principals, and superintendents—professionals already in short supply—who fear personal financial ruin from litigation. In contrast, allowing official-capacity suits against school board officials would encourage boards to adopt policies that promote care, training, and oversight. It would also reassure education professionals that they are not personally exposed when the system fails. In the long run, such a framework promotes accountability where it belongs—at the institutional level—while supporting a more stable, secure, and competent workforce.

IV: Conclusion

Virginia's doctrine of sovereign immunity is not absolute, and school boards are not entitled to absolute immunity. In *Kellam*, the Court evaluated school boards in the manner akin to municipal corporations today. School boards are not the sovereign, and they are surely not more sovereign than the state itself. Moreover, sovereign immunity in Virginia has evolved post-*Kellam*. At a minimum, lawsuits alleging acts of gross negligence by school employees must be allowed to proceed. The trial court erred in dismissing Drasovean's suit at the plea in bar stage. Official-capacity suits do not enjoy absolute immunity by title alone. The case should have been remanded for factual development and further proceedings on the merits.

Athey, J., with whom Causey, Chaney, and Bernhard, JJ., join, dissenting.

Consistent with longstanding precedent, local government employees, making decisions within the scope of their employment, are not immune from claims of gross negligence as a result of those decisions. Hence, I would have reversed the circuit court's decision to grant the school board employees' plea in bar based upon the employees' claim of sovereign immunity. Thus, because I agree with the outcome of Judge Causey's dissent from the majority opinion and would have reversed the decision of the circuit court granting the plea in bar, I join her dissent. I write separately, joined by several of my colleagues, however, to assert separate grounds in support of reversing the decision of the circuit court, which granted the school board employees' plea in bar in error.

In support, we would first note that the Court of Appeals of Virginia serves as an intermediate appellate court whose core purpose is to correct errors. Hence, we exercise *modest* judicial power and "do not, or should not, sally forth each day looking for wrongs to right. Instead, [we] wait for cases to come to [us], and when [cases arise, we] normally decide only those questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc)). Thus, it is not the prerogative or purpose of this Court to enunciate new precepts of law or to expand legal doctrines where existing precedent speaks conclusively on the matter. Nor is it "our function to avoid or evade the clear implications of the decisions of the Virginia Supreme Court through characterizing unambiguous statements as dicta or by simply ignoring those decisions that lead to results that are different from how we might decide an issue in the first instance." *King William Cnty. v. Jones*, 66 Va. App. 531, 552 n.17 (2016) (en banc). Based on these fundamental principles, when analyzing questions presented to us on appeal, we are limited to determining whether the trial court erred—and nothing further.

To that end, "[e]lementary is the rule of appellate procedure that the scope of the argument on appeal is limited by the assignments of error." *Dudley v. Est. Life Ins. Co.*, 220 Va. 343, 348 (1979). Here, the majority opinion abandons that foundational principle by focusing its analysis on whether and to what extent sovereign immunity applies to *school boards* based upon the common law and the statutory framework of the VTCA.

As a result, the majority opinion addresses an issue that was never properly presented to the circuit court below or to this Court on appeal. For example, Drasovean assigned error to the circuit court's decision to grant the school board employees' plea in bar after "determin[ing], as a matter of law, a government official's sovereign immunity protects the *official* from gross negligence claims *when sued in their official capacity*."[10] (Emphases added). Thus, contrary to the framing of the issue to be decided in the majority opinion, the assignment of error in this case does not challenge "whether school boards themselves partake in the Commonwealth's sovereign immunity in tort."

> A. *Since neither the school board nor its elected members were party defendants when the plea in bar was granted, the Majority Opinion can only serve to advise non-parties concerning the extent of a school board's sovereign tort immunity.*

Initially, the majority agrees with our contention that the facts pleaded by Drasovean, if true, constitute a prima facie case of gross negligence based upon the actions of these school board employees. In addition, we agree with the majority that precedent exists to support its contention that the Prince William County School Board would have enjoyed absolute immunity in tort had it been a party defendant. However, we fundamentally disagree with the majority because the question of whether the school board enjoys absolute sovereign immunity from tort

---

[10] The distinction between government officials and government employees semantically in this context is a distinction without a difference. *See James v. Jane*, 221 Va. 43, 53 (1980) (noting the distinction "between the state . . . and the *employees and officials* of the state" in terms of the scope of sovereign immunity protections (emphasis added)).

liability only incidentally matters in the outcome of the actual issue that must be resolved by this Court. Instead, we contend in dissent that based upon 1) the actual assignment of error below; 2) the circuit court's misunderstanding of the issue before it when granting the plea in bar; and 3) the uncontroverted fact that neither the school board nor its members were party defendants subject to the entry of a judgment when the circuit court granted the plea in bar in error, the actual question this Court must resolve is whether the school board's sovereign immunity extends to these particular employees of the school board who were allegedly making grossly negligent decisions in their official capacity as administrators.

Drasovean's specific assignment of error verbatim is that:

> The trial court erred by granting Appellees' plea in bar in which it determined, as a matter of law, a government official's sovereign immunity protects the *official* from gross negligence claims *when sued in their official capacity*.

(Emphases added). Hence, in this case, the "officials" Drasovean sued as a result of their allegedly grossly negligent decisions were employees operating in their "official capacity," including the Superintendent of Prince William County Public Schools ("PWCPS"), PWCPS's Director of Special Education, and the principal of C.D. Hylton High School—all *employees* of the school board. Thus, the word "officials" in the complaint could not have included the elected members of the school board but solely the school board employees named in the complaint who allegedly made the grossly negligent decisions complained of while working in their official capacity as administrators within the school system.[11] We would also infer from the record that

---

[11] Hence our agreement with the majority is solely that *Kellam v. School Board of the City of Norfolk*, 202 Va. 252 (1960), supports their argument that these employees are entitled to *some* sovereign tort immunity. Our disagreement centers on the extent of that immunity and the contexts in which it applies. We do not weigh in on the sovereign immunity entitled to elected members of a school board as that question is not before this Court, in order to resolve this appeal on existing precedent, the "best and narrowest grounds available." *Harris v. Wash. & Lee Univ.*, 82 Va. App. 175, 205 n.15 (2024).

the school board's decision to not intervene in the case matters. This conclusion is derived from the procedural history of this case as well as Drasovean's pleadings in the circuit court which reflect that neither the school board nor its members are named as party defendants in this case. We would further rely on Virginia common law pleading requirements that will not permit a judgment against any party not named as a defendant in the complaint.

1. <u>The procedural history demonstrates that neither the school board nor its individual members were party defendants, and therefore neither the school board nor its members can be reached by any judgment against these employees named as defendants in the complaint.</u>

This suit was initially filed by counsel in the Circuit Court of Prince William County on January 22, 2019, styled as "*Drasovean v. Virginia Board of Education*, *et al.*" averring three claims against the Virginia Board of Education, PWCPS, and the employees, including: 1) a "negligence/gross negligence [claim] pursuant to Virginia common law against all Defendants"; 2) "a claim for damages resulting from the deprivation of constitutional rights, pursuant to 42 U.S.C. § 1983, against all Defendants"; and 3) a claim for "violation of Section 504 of the Rehabilitation Act of 1973 . . . and Title II of the Americans with Disabilities Act ("ADA") against all Defendants." This case was subsequently removed to the United States District Court for the Eastern District of Virginia.[12] Following removal to the federal court system, Drasovean, this time *pro se*, filed the same "three claims for relief," naming the Virginia Board of Education, PWCPS, and the school board employees in their official capacity as party defendants.

---

[12] This case's procedural history is murky as evidenced by the pleadings filed in the circuit court and the Eastern District. The employees in moving for a protective order to stay discovery pending the resolution of the plea in bar attached Drasovean's first filed complaint, which provided it was filed by counsel. However, upon its removal to the Eastern District, the order entered dismissing Drasovean's federal claims and remanding her complaint back to the circuit court noted that she proceeded before that court *pro se*, without explanation of why her counsel before the circuit court did not take up the case before the Eastern District. This procedural and representational twist was omitted from her description of the matter upon refiling.

*Drasovean v. Va. Bd. of Educ.*, No. 1:19-cv-286, 2019 U.S. Dist. LEXIS 250619, at *5-6 (E.D. Va. May 3, 2019). The claims filed in federal court included: 1) a "negligence/gross negligence [claim] pursuant to Virginia common law against all Defendants"; 2) "a claim for damages resulting from the deprivation of constitutional rights, pursuant to 42 U.S.C. § 1983, against all Defendants"; and 3) a claim for "violation of Section 504 of the Rehabilitation Act of 1973 . . . and Title II of the Americans with Disabilities Act ("ADA") against all Defendants." *Id.* Applying federal precedent, the Eastern District dismissed the 42 U.S.C. § 1983 and ADA claims against all defendants, including the school board employees, on the grounds that under federal precedent, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, *to be treated as a suit against the entity*. It is not a suit against the official personally, for the real party in interest is the entity." *Id.* at *8 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). "Thus, [the Eastern District reasoned that] for purposes of sovereign immunity, Plaintiff's action is essentially a *respondeat superior* action against the School Board for the acts of the teachers or other unspecified officials responsible for supervising and caring for [student] and [Drasovean]." *Id.* For this reason, the Eastern District dismissed the *federal* claims against all defendants. *Id.* However, the Eastern District qualified their ruling dismissing all claims, holding that under the same precedent, "[t]he School Board and its employees sued in their official capacities are not arms of the state and are therefore not absolutely immune from suit under the Eleventh Amendment." *Id.* The Eastern District further found that the claims failed at that time because Drasovean did not allege that the harm she suffered stemmed from conduct proscribed by the federal statutes implicated. *See id.* at *9. Thus, the Eastern District found that it had lost jurisdiction concerning Drasovean's gross negligence claims and remanded those claims back to the circuit court to "allow [her] to pursue her negligence action there." *Id.* at *12.

Following remand to the circuit court and after again retaining counsel, Drasovean filed an amended complaint in the Circuit Court of Prince William County strictly against the school board employees named as defendants. Neither the school board nor the individual members of the school board were party defendants in the refiled circuit court complaint.[13] Hence, it became impossible for the school board or its individual members to have a judgment rendered against them. *See Nationwide Mut. Ins. Co. v. Hylton*, 260 Va. 56, 61 (2000) (noting in cases *ex delicto*, with a cause of action arising from tort, a plaintiff who files a tort action for injuries caused by one party cannot recover a tort judgment in that action against a non-named party). Here Drasovean sued the school board employees for gross negligence committed while working "in their official capacity." The complaint further alleged that the individual school board employees owed a Virginia "common-law duty of ordinary care to [Drasovean] to supervise and care" for her *and* that the employees violated their duty of care by placing a student known to them to be prone to abusive conduct in a class with her, a child with special needs unable to protect herself from abusive conduct. The record thus reflects that although the school board may have been a party defendant in the complaint filed in the Eastern District, neither the school board nor its members ever sought to intervene in this case nor have either ever been a party defendant in this litigation as defined by the Supreme Court of Virginia. *Bonanno v. Quinn*, 299 Va. 722, 730 (2021) (defining "party" as "[o]ne by or against whom a lawsuit is brought; anyone who both is directly interested in a lawsuit *and* has a right to control the proceedings, make a defense, or appeal from an adverse judgment; litigant[;] as in 'a party to the lawsuit'" (quoting *Party*, *Black's Law Dictionary* (11th ed. 2019))). Thus, in examining the complaint, we would

---

[13] Our further references to the "complaint" are to this refiled complaint. We would also note that in filing the plea in bar, counsel for the defendants noted that he was only representing them and was not also representing the school board or its members. Thus, the school board never intervened in this case.

conclude that the school board is merely being invoked by its employees to support their claim that they enjoy the absolute sovereign immunity accorded to the school board, solely upon the basis of Drasovean's inclusion of the language "in their official capacity" in defining them in her complaint. This failure to note the school board as a party would also have been fatal to Drasovean's complaint if it hinged on a respondeat superior theory of harm. *Hughes v. Doe*, 273 Va. 45, 48 (2007) (holding "under Virginia law [that] a plaintiff pursuing relief against an employer on a theory of respondeat superior" is merely required to file an action against the employer as "[n]o judgment against the employee individually is necessary for recovery; only a finding that the employee was negligent"). Thus, there is no theory of recovery under Virginia law that would have permitted a judgment against the school board based on Drasovean's particular complaint.

For example, Drasovean's complaint solely contends that these three school board employees were grossly negligent in undertaking actions "in their official capacity" as a part of their employment. The complaint simply avers that Drasovean is suing the school board employees without the qualifying language in their "official capacity." The complaint lists each defendant's position in the school system along with the employee's *personal* address. Although the complaint states that these employees are being "sued in [their] official capacity" while noting each of their administrative positions within the school system as well as their job duties as those duties relate to the gross negligence claims, neither the high school nor the school board nor any school board members are listed as a party defendant. The complaint did not contend that the named employees were negligent for following the school or the school board's policies or procedures. Hence, the allegations in the complaint simply do not implicate the employer but instead focus on the conduct of the employee in undertaking their (official) day-to-day responsibilities.

Second, the pleaded allegations of negligent conduct were that these *individuals* were negligent in deciding to place the abusive child in the same class with Drasovean, and for failing to monitor the allegedly abusive child to prevent the abusive conduct that allegedly occurred. Even the alleged duty breached by these employees was not that they failed to do what the school board required by its policies but instead their *common law duty of ordinary care*, which stems from their capacity as individuals. Finally, Drasovean's prayer for relief was limited to *compensatory* damages from these three employees for "repeated gross negligent acts, which show[ed] indifference to [Drasovean] and constitute[d] an utter disregard of prudence." According to the complaint, the grossly negligent acts stemmed from the Superintendent's erroneous "promulgation" of the rules and procedures that the other employees erroneously followed leading to the harm to the child in question. Nowhere in the complaint are any grossly negligent "acts" attributed to a failure to follow the school or the school board's directives. Based upon the allegations in the complaint, which the circuit court must deem true during the plea in bar, it seems clear that the circuit court erred because all the allegations are against these officials—*acting* in their official capacity as employees of the school and school board. Thus, we contend that the omission of the school board as a party in this case does affect the application of sovereign immunity to government employees sued "in their official capacity" since without the school board as a party defendant, the school board cannot be held liable in tort. We would commend that this conclusion is evident from the common law mechanics of sovereign immunity and their adoption in early American and Virginia caselaw.

2. Under applicable Virginia precedent as derived from the common law, the "in their official capacity" language is at most surplusage since the school board is not a party defendant and the relief sought could never lead to a judgment against the school board.

Since time immemorial, the principle of sovereign immunity in Anglo-American jurisprudence has been derived from the maxim *rex non potest peccare*, an "ancient and

- 49 -

fundamental principle of the English constitution, that the *king* can do no wrong." Herbert Broom, *A Selection of Legal Maxims, Classified and Illustrated* 23 (1845) (emphasis added). Blackstone conceptualized this principle in simple terms, noting that "the law ascribes to the king the attribute of sovereignty," and thus, "no court can have jurisdiction over him" because "jurisdiction implies superiority of power." *Clark v. Va. Dep't of State Police*, 292 Va. 725, 728 (2016) (quoting 1 William Blackstone, *Commentaries* \*241-42). Though strongly worded, this common law immunity was far from absolute as Parliament provided venues for aggrieved individuals to petition the Crown for relief due to its actions, except in cases where the Crown's *own servants* committed a tort. *See* Louis L. Jaffe, *Suits against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 8 (1963) ("Since, it was argued, the King cannot commit a tort, no one can commit a tort in his name—one who cannot do a thing himself cannot do it by another."). But that immunity for the Crown's "servants" only extended to "those high secretaries who function directly for him in the conduct of government," not their lay agents. *Id.* at 15; *see, e.g.*, Albert Venn Dicey, *Law of the Constitution* 189 (8th ed. 1923) ("With us every official, from the Prime Minister down to a constable or a collector of taxes, is under the same responsibility for every act done without legal justification as any other citizen."). Thus, at common law, an officer's absolute immunity from tortious liability was limited to direct members of the sovereign itself, and their high-ranking decision-making agents. *See* Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1367 (2021) (noting that "[t]he best reading of the case law and treatises [from the time] suggests that the common law in 1871 would have extended absolute immunity to the discretionary acts of high-ranking executive officers" but not to other government officials).

From this historical backdrop came the proposition that the majority broadly expounds here: that a suit against an officer of the sovereign in his official capacity constitutes a suit

against his *office* because the officer was "subordinate to others, [and had] no directory power" outside of what the sovereign gave him.[14] *Vernon v. Blackerby*, 2 Atk. 144, 145, 26 Eng. Rep. 491, 491 (K.B. 1740). Where suit lied against the *office*, sovereign immunity would bar suit against the sovereign entity (the Crown) whereas the claim would still lie against the officer himself for acts taken in that *official* capacity, with his immunity solely extending to the acts taken by subordinates beneath him, sufficient to defeat the application of respondeat superior. *See Lane v. Cotton*, 1 LD. Raym. 646, 650, 91 Eng. Rep. 1332, 1334 (K.B. 1701) (holding that as the postmaster general was a servant of the Crown as provided by an Act of Parliament, he was not liable for negligence in delivering the mail caused by his "deputies"). Thus, under the common law, the Government entity itself and certain "high secretaries" were entitled to such "absolute immunity." *See* Keller, *supra*, at 1367. But this immunity was not enjoyed by the majority of employees of the government.

Consistent with this common law development, early Virginia courts found that *officers of the sovereign* were entitled to a *limited* sovereign immunity in their *official capacity*, when engaging in non-ministerial discretionary actions pursuant to their office. *E. Lunatic Asylum v. Garrett*, 68 Va. (27 Gratt.) 163, 170 (1876) (enumerating ministerial and governmental act distinction to impose liability for an officer's actions taken in their role as a government official). This immunity only extended to the governmental entity and its high-ranking officials. *See*

---

[14] In extrapolating this principle, the majority derives its conceptual thrust upon a concession by Drasovean's counsel in response to a question from the bench during oral argument, wherein counsel agreed without elaboration that a suit against the "individuals" in their "official capacity" was in effect "a suit against the school board as an entity." Although we agree with this general concept at a certain level of abstraction, we contend that the concept was erroneously applied under the facts of this case. In any event, even if one construes the response as a "concession," the concession could only have been a mere conclusion of law, not a stipulation of fact. Thus, we are not bound by the opinions of counsel concerning questions of law, even where opposing counsel agree. *See Cofield v. Nuckles*, 239 Va. 186, 194 (1990) ("A party can concede the facts but cannot concede the law.").

*Sayre v. N.W. Tpk Rd.*, 37 Va. (10 Leigh) 454, 456 (1839) (conferring sovereign tort immunity to a municipal corporation's "president and directors" where it was "composed as it is exclusively of officers of the government, having no personal interest in it, or in its concerns, and only acting as the organ of the [C]ommonwealth in effecting a great public improvement").  It did not apply to the lower officers themselves, unless they were sued in their *official capacity*.  *De Ende v. Wilkinson's Adm'r*, 2 Patton & H. 673, 677 (Va. 1857) (holding that in seeking recovery "[f]or such negligence he should be left to his remedy against those by whose negligence he was injured").  And actions taken by these employees using their discretion did not immunize them from their own negligence.[15]  *See Rives v. Bolling*, 180 Va. 124, 130 (1942) (finding a police officer negligent for killing a bystander after a mishap occurred while he cleaned his assigned firearm, reasoning that though he was on duty and performing "work or acts assigned to him as an officer," he was not immunized as "[n]egligence is of itself no part of official duty").

In England, several pleading forms existed at the common law to prosecute the actions of government officials.  *See* Jaffe, *supra*, at 1-2 (noting that "[i]f the subject was the victim of illegal official action, in many cases he could sue the King's officers for damages" through several pleading types).  As applied in early American and Virginia cases, a variety of pleadings were used to seek a remedy from government employees.[16]  And in these suits, both federal and

---

[15] Such negligence could stem from malfeasance or nonfeasance and the negligence of defendant's actions was thought to "bring[] [the official] outside the protection of his authority." James A. Willett, *Virginia's Law of Sovereign Immunity: An Overview*, 12 U. Rich. L. Rev. 429, 435 (1978).

[16] The pleadings generally utilized in such suits were first a petition for a writ of "mandamus" where "a plain official duty, requiring no exercise of discretion, is to be performed, and [if] performance [were] refused," a person would "sustain personal injury by such refusal," *Bd. of Liquidation v. McComb*, 92 U.S. 531, 541 (1875), this type of suit would be brought as an "injunction" where the harm in question was a "threatened wrong," *Bull v. Read*, 54 Va. (13 Gratt.) 78, 87 (1855).  However, where the harm stemmed from the conduct of a subordinate, an action against the official would be brought for "all the acts of his deput[ies], colore officii." *Goode v. Galt*, 21 Va. (1 Gilmer) 152, 153 (1820).  And finally, parties would bring suits against

state, the composition of the parties to the suit influenced whether sovereign immunity shielded the officer from liability. Jaffe, *supra*, at 24-27; James A. Eichner, *A Century of Tort Immunities in Virginia*, 4 U. Rich. L. Rev. 238, 253-54 (1970) (noting the different applications of sovereign immunity to officers acting in their capacity as employees of the sovereign). In fact, contrary to the majority's core holding, these considerations had enough of an impact that under the common law it was conceded that "a suit against an officer of the state [wa]s not, necessarily, a suit against the state" by pleading alone. *Blanton v. S. Fertilizing Co.*, 77 Va. 335, 337 (1883).

Originally, as applied by the United States Supreme Court, where the plaintiff sued a government employee acting in their official capacity as such and did not include the government as a party, the result was in essence a suit against the employee in their *individual capacity* to the extent the relief sought ran against the officer and not the government.[17] *See Osborn v. President, Directors & Co. of Bank*, 22 U.S. 738, 851, 857 (1824) (Marshall, C.J.) (noting the ancient position that the impact of the Eleventh Amendment was "of necessity, limited to those suits in which a State is a party on the record" after analyzing analogous English common law authority), *superseded by statute*. In such cases, to decide "who are parties to the suit the court will not look beyond the record. Making a State officer a party does not make the State a party, [although] her law may have prompted his action, and the State may stand behind him as the real party in interest." *Davis v. Gray*, 83 U.S. 203, 220 (1872) (interpreting whether a

the official and the Government, *eo nomine*, usually to seek recompense for harm inflicted by an officer, ultra vires or under an unconstitutional statute. *See United States v. Lee*, 106 U.S. 196, 196 (1888), *superseded by statute*.

[17] Though Eleventh Amendment precedent cannot be foisted upon our interpretation of Virginia's sovereign doctrine wholesale, we would note that its analysis of the preceding common law regime is sufficiently persuasive of application over the principal concurrence's objection. We would find the precedent is important for our purposes in that this precedent's discussion of the common law rule "continue[s] in full force within the [Commonwealth], and [is] the rule of decision, except as altered by the General Assembly." Code § 1-200.

suit against a railroad receiver was a suit against the State of Texas). If a party sued an officer's office without regard to his person, then the suit was entirely against the government as "[n]o person in his natural capacity [wa]s brought before the Court as defendant," making the suit against the Government, though it had yet to be pleaded in as a party. *Governor of Ga. v. Madrazo*, 26 U.S. 110, 124 (1828) (enslaved persons at issue). The same result was compelled in cases where although the State was "not made a party defendant," the pertinent allegations and relief sought "would have the same effect as if it were rendered directly against the State." *Smith v. Reeves*, 178 U.S. 436, 438-39 (1900). But this determination was not made off of allegations that an employee was acting "in their official capacity" alone.[18] *Scully v. Bird*, 209 U.S. 481, 490 (1908) (performing a full analysis of allegations brought against an officer in their official capacity before concluding that "[i]t is manifest from this summary of the allegations of the bill that this is not a suit against the State"). Instead, the reviewing court had to analyze the pleadings and the record to determine which parties were "nominal" parties to the proceedings

---

[18] In fact, it was entirely recognized that

> where an individual is sued in tort for some act injurious to another in regard to person or property, to which his defence is that he has acted under the orders of the government. In these cases he is not sued as, or because he is, the officer of the government, but as an individual.

*Pennoyer v. McConnaughy*, 140 U.S. 1, 14 (1891) (quoting *Cunningham v. Macon & B. R. Co.*, 109 U.S. 446, 452 (1883)). And in such cases,

> [a] defendant sued as a wrong-doer, who seeks to substitute the State in his place, or to justify by the authority of the State, or to defend on the ground that the State has adopted his act and exonerated him, cannot rest on the bare assertion of his defence. He is bound to establish it.

*Poindexter v. Greenhow*, 114 U.S. 270, 288 (1885).

and which ones were the real parties in interest. *Poindexter v. Greenhow*, 114 U.S. 270, 287 (1885).

Thus, in cases where the government was a mere "nominal" party, the plaintiff could recover in tort from the officer, even sued in their official capacity, if the allegations showed "the personal act of the individual defendant, [which] constituted a violation of right for which the plaintiff was entitled to a remedy at law or in equity against the wrongdoer in his individual character." *In re Ayers*, 123 U.S. 443, 502 (1887). This analysis, requiring the reviewing court to consider the totality of the allegations in the complaint, the parties involved, and the relief sought in conjunction with the officer's "official capacity," is the law Virginia has applied in the common law context. *Bd. of Public Works v. Gannt*, 76 Va. 455, 465-66 (1882) (performing this analysis in concluding "[w]hatever they may be in form, [the suits in question] are in effect suits against the State"); *Blanton*, 77 Va. at 338 (disposing of a sovereign immunity argument on demurrer as "the demurrer admits the facts charged in the bill, and if the acts attempted to be done by the commissioner of agriculture in the exercise of his office be illegal, the jurisdiction of the chancery court . . . , [wa]s plain and unquestionable").

The majority opinion fails to address the lack of any allegations in the complaint against the school board in its analysis. It further declines to analyze the omission of the school board as a party defendant as the omission relates to Drasovean's otherwise well-pleaded gross negligence claim. Instead, to escape the precedent, the majority imposes the spectre of the immunity of the school board onto Drasovean's Virginia common law gross negligence claims despite the fact that the school board is explicitly *not a party*. And its basis for summoning the non-party school board out of the ether to immunize its employees from Drasovean's well-pleaded gross negligence allegations is solely her use of the seemingly magic words "in their official capacity."

This jurisprudential séance, though expedient, is misguided as it wholly disregards that immunity flows from the sovereign, who has yet to intervene in this Court (and in the circuit court) as either a party defendant or plaintiff for that matter. And it discards the very analysis that is applied to common law claims against officers. *See Gannt*, 76 Va. at 465-66. Here, outside of how Drasovean defined the employees' relationship to the suit, there is little mention of the school board's involvement in this case. Thus, we conclude that Drasovean's allegation that the employees were "sued in their official capacity" is mere surplusage as the complaint at core seeks relief against the employees for *actions in their official capacity*. Without the "Crown" either as a party defendant, or the "real party" in interest to the complaint's allegations, how could one conclude otherwise? *Poindexter*, 114 U.S. at 287.

Although the school board theoretically could intervene as a party in the future if there were to be a remand, at core, the school board was not a party to the proceedings before the circuit court when the plea in bar was decided nor is the school board a party to the appeal before this Court. Thus, as previously stated, the school board was barred from raising any defense nor could it have been held liable for any judgment obtained in the circuit court. Moreover, the school board has never attempted to intervene in this matter to claim that it is a party subject to judgment based on the pleadings nor has it raised its sovereign immunity as a plea in bar. Taking Drasovean's allegations as true, her requested relief could only run against the employees, a hallmark of what the majority would claim is an individual capacity suit. Thus, the defining of the employees as "in their official capacity" must be mere surplusage denoting that the actions in question were undertaken by individuals who happened to be employed by a government entity in their course of such employment. Therefore, we find any discussion of the school board's sovereign immunity simply a red herring given the complaint, which merely

alleges a gross negligence tort claim against employees of a local government body in the course of their performance, not against the school board itself.[19]

3. In its application of *Kellam* and other distinguishable caselaw, the majority errs in the face of existing state precedent by adopting federal pleading practice procedure thereby expanding the scope of absolute sovereign immunity in Virginia to derivatively immune government employees.

Here, based upon the assignment of error, the pleadings below, and the appellant's brief, the ultimate question presented to this Court is whether school board *employees*—sued in their official capacity as *employees*—enjoy sovereign immunity from gross negligence claims. Taking into consideration the historical development of the sovereign immunity doctrine in Virginia, we are compelled to answer this narrow question in the negative.

First, we submit that the majority errs *precedentially* by applying *Kellam v School Board of the City of Norfolk*, 202 Va. 252 (1960), a case which only involves the immunity of school boards, not their employees, to the facts in this case. By doing so, the majority seemingly bestows absolute derivative immunity to grossly negligent school board employees in the face of

---

[19] The majority opinion incorrectly construes Drasovean's assignment of error before this Court en banc as contending that the school board is not protected by sovereign immunity in all consequences and contexts. On brief, Drasovean specifically advances two separate theories of error. First, she contends that the General Assembly has explicitly abrogated school board tort immunity under the *VTCA*, Code § 8.01-195.2. Second, she asserts that under the "general rule" "a government agent" is not immune from tort suit under "gross negligence." Since both arguments were preserved for this Court's review, counsel's decision to respond to this Court's questions on their first theory does not constitute a waiver of the second. *See* Rule 5A:28(e) ("During oral argument, it is not necessary for any party to expressly preserve any argument made on brief, and the failure to raise any such argument does not constitute a waiver."). At oral argument, Drasovean did not waive or abandon her second argument and acknowledged the argument's application to the facts here. In advancing her first contention, Drasovean seeks to cut off the school board employees' sovereign immunity contention by asserting that the definition in Code § 8.01-195.2 characterizes the school board, and by extension, its employees as not being a part of the sovereign and therefore not cloaked with sovereign immunity. Based on that reasoning, if the school board and the employees are not a part of the sovereign, then they are entitled to no sovereign immunity whatsoever. Her second assertion, however, is distinctly different. It merely retreats to established precedent to hedge against the rejection of her first argument. And thus, both stand apart for purpose of our review. Our focus in this dissent is the application of her second assertion.

existing caselaw that says otherwise. Second, the majority further errs *doctrinally* by applying both distinguishable and inapplicable federal pleading practice precedent in determining that inclusion of the language "in their official capacity" bestows sovereign immunity on the school board employees in this case. We take each error in turn.

As noted by both the majority and the principal dissent, in *Kellam*, the Supreme Court of Virginia extended sovereign immunity to "school district[s], municipal corporation[s involved with education], [and] school board[s]" as they "*act[] as an agent for the state*." *Kellam*, 202 Va. at 255 (emphasis added) (quoting *Krutili v. Bd. of Educ., Butler Dist.*, 129 S.E. 486, 486 (W. Va. 1925)). However, we note that the Supreme Court was notably silent concerning the application of sovereign immunity to school board *employees* in its ratio decidendi.[20] Instead, *Kellam*'s ratio decidendi is that *school boards* are "not, in the absence of a statute imposing it, subject to liability for injuries to pupils of public schools suffered in connection with their attendance thereat." *Id.*; *see also Maddox v. Commonwealth*, 267 Va. 657, 664 (2004) (opining on *Kellam* in a suit pertaining to injuries suffered by a slip and fall that *Kellam* "held that the *school board* had *acted in a governmental capacity* and was therefore immune from liability for both the negligence and nuisance claims" (emphases added)). Since the school board is not a party defendant, the conclusion in *Kellam* is not in question here.

---

[20] We recognize that this Court is bound by "[t]he doctrine of stare decisis, which is 'more than a mere cliche,' [which] is strongest 'when a *court of last resort* has established a precedent, after full deliberation upon the issue by the court.'" *Jennings v. Commonwealth*, 82 Va. App. 692, 706 (2024) (en banc) (quoting *Selected Risks Ins. Co. v. Dean*, 233 Va. 260, 265 (1987)). "'*Stare decisis*' applies not merely to the literal holding of the case, but also to its '*ratio decidendi*—the essential rationale in the case that determines the judgment.'" *Commonwealth v. Holland*, ___ Va. ___, ___ (Jan. 6, 2025) (quoting *Womack v. Commonwealth*, 82 Va. App. 289, 303 (2024)). "In other words, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Id.* at ___ (internal quotation marks omitted) (quoting *Womack*, 82 Va. App. at 303).

*Kellam*, however, is not a derivative immunity case and therefore does not address whether the school board's immunity applies to employees of the school board acting in their official capacity. Moreover, under the current rule pertaining to the *derivative* immunity of an otherwise immune government employee, "[a]llegations of gross negligence can pierce through a derivative sovereign-immunity defense asserted by an otherwise immune government employee." *Patterson v. City of Danville*, 301 Va. 181, 197 (2022); *see, e.g.*, *Koffman v. Garnett*, 265 Va. 12, 15-16 (2003) (applying sovereign immunity to bar a plaintiff's simple negligence claims against a football coach in his official capacity but reversing the circuit court's dismissal in part, due to well-pleaded allegations of gross negligence). Thus, *Kellam* does not lend itself to the rather grandiose application suggested by the majority, which would effectively immunize grossly negligent actions taken by a school board's lay employees.

Second, the majority further supports their erroneously expanded interpretation of *Kellam* by tacitly adopting a pleading standard from federal precedent, which equates federal suits against a government employee with federal suits against the government agency employing said government employee. This expansive interpretation conveniently avoids common law precedent that would require the circuit court to examine the complaint and record before making such a determination. Also, a key underpinning of the majority's analysis concedes that their analysis is derived solely from federal cases, where "official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent' and in essence are 'suits against the entity.'"[21] *Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000)

---

[21] Hence, facially in terms of the *Eleventh Amendment*'s application to an officer's conduct, "[s]tate officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them." *Hafer v. Melo*, 502 U.S. 21, 27 (1991). However, the majority fails to denote the important distinction that plaintiffs are permitted to sue employees in their "official capacity" for actions undertaken by the officer in that capacity, as opposed to suits against the office they occupy.

- 59 -

(quoting *Graham*, 473 U.S. at 165-66). The majority's characterization may be consistent with the common law in the abstract, since at common law the sovereign could only act through its officers, thereby entitling such officers to some protections for actions they undertook to serve the sovereign. *See Vernon*, 2 Atk. at 145, 26 Eng. Rep. at 491; *Lane*, 1 LD. Raym. at 650, 91 Eng. Rep. at 1334. But we disagree that this proposition in the abstract supports the majority's application of that general principle here.

First, the majority reasons that as "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 89 (1989) (quoting *Brandon* v. *Holt*, 469 U.S. 464, 471 (1985)), such officials are entitled to invoke the *absolute* immunity of the sovereign, not the *derivative* immunity that they would normally be entitled to, solely due to the denoting of "official capacity" in the complaint. *See Printz v. United States*, 521 U.S. 898, 930-31 (1997) (noting under the federal Brady Act that the term "individuals" directs its application to officers in "their official capacities as state officers; it control[ling] their actions, not as private citizens, but as the agents of the State"). In other words, the majority entirely equates this common law gross negligence suit filed against a government employee in their *official* capacity, with, in essence, a common law gross negligence suit against the *government* in all respects. Hence, under the majority's construction, government employees are absolutely immunized from tort liability at the plea in bar stage by reliance on this federal pleading procedure alone, obviating any need to introduce evidence supporting the extent of the employee's relationship with the sovereign. Although we agree with the majority that these terms are "terms of art" and the terms are not "interchangeable," we would disagree with the majority's theory of how they impact a case. *Suffolk City Sch. Bd. v. Wahlstrom*, 302 Va. 188, 221 (2023). Moreover, we contend that the federal term of art "official capacity" doesn't have the weighty effect espoused by the

- 60 -

majority in all cases and circumstances. In fact, the cases cited by the majority actually support denial of the plea in bar and permitting these common law gross negligence claims to go forward since nothing about these authorities suggests that they supplant the general rule that applies where common law gross negligence claims are asserted against government employees.[22] Hence, we would have found that our existing "immunity-liability patchwork" suggests that a more supple rule exists at the plea in bar stage than the majority's analysis admits.[23] *Hinchey v.*

---

[22] Under current Virginia law, the majority's reasoning in the venue context makes sense as the proper venue for a suit depends on whether the officer was sued in their "individual capacity" or "in his official capacity." *Dowdy v. Franklin*, 203 Va. 7, 11 (1961) (analyzing Virginia's previous venue statute, former Code §§ 8-38(9), 8-40, and 8-752); *see also* Code § 2.2-3127 ("Any prosecution for a violation involving an employee serving at the state level of government shall be within the jurisdiction in which the employee has his principal place of state employment."). This intuition is even further bolstered by Virginian secondary authorities discussing this distinction. *See* 1 *Bryson on Virginia Civil Procedure* § 4.02 (5th ed. Lexis Nexis Matthew Bender 2025) ("Except for these proceedings, when an officer of the state is sued in his official capacity, the preferred venue is the place where his office is located."); 1 Friend & Sinclair, *Friend's Virginia Pleading and Practice* § 3.03[2](2) (3d ed. 2025) ("Action against one or more officers of the Commonwealth in an official capacity. Except as provided in § 8.01-261, subdivision 1, where the action is against one or more officers of the Commonwealth in an official capacity, the preferred jurisdiction is the county or city where any such person has his official office.").

[23] The authorities the majority analyzes are inapposite to apply to common law negligence claims as they either involve distinct statutory schemes where liability is specifically imposed on employees of a government entity, or involve situations where the employee introduces evidence showing their relationship to the sovereign and how it immunizes the pleaded negligence as required by the rule provided in *Poindexter*. *See, e.g.*, *Wahlstrom*, 302 Va. at 221 (opining in the VFOIA context that "[i]t is clear that, in adopting VFOIA, the General Assembly was aware that 'official capacity' and 'individual capacity' are distinct concepts" because "[i]n identifying who may bring a VFOIA enforcement action under Code § 2.2-3713, the General Assembly included 'the attorney for the Commonwealth *acting in his official or individual capacity*'"); *Maddox*, 267 Va. at 664 (analyzing the *Commonwealth's* immunity pertaining to simple negligence and nuisance claims stemming from a slip and fall); *Niese v. City of Alexandria*, 264 Va. 230, 239 (2004) (analyzing the application of sovereign immunity to a municipality from its employee's conduct under the "ministerial" and "governmental" distinction outside of the VTCA); *Hinchey v. Ogden*, 226 Va. 234, 239 (1983) (finding that a State Department of Highways employee acting in their official capacity was immune in a non-VTCA suit where the employee's action in question arose from a governmental function in executing a "special account" project, where the official introduced testimony and certain documentary exhibits supporting his immune status).

*Ogden*, 226 Va. 234, 243 (1983) (Cochran, J., dissenting) (noting that even though a defendant was sued in his official capacity and introduced evidence supporting his immunity, "[t]he negligent employee of an immune employer should be liable for his negligence, as we held in *Crabbe*, *Short*, and *James*").

From these authorities cited by the majority, the procedural posture here matters because the determination that the school board employees are entitled to sovereign immunity requires more factual development than what was before the circuit court when it made its determination on plea in bar. *Id.* at 237 (noting that the employee defendant "introduced testimony and certain documentary exhibits" in supporting its motion to dismiss the plaintiff's torts claims). So, even based on its own authorities, more factual development was necessary before the circuit court granted the plea in bar. Since we seek to avoid creating a new rule beyond what our Supreme Court has already instructed, we would have found the authorities relied upon by the majority to be at most persuasive in comparison to those cases we turn to next.

4. The majority's application of absolute sovereign immunity to bar gross negligence claims against government employees when the government is not a party defendant risks immunizing government employees for grossly negligent acts in dereliction of their common law duty of care.

Finally, we warn that the majority's interpretation here would effectuate a sea change in Virginia sovereign immunity law as it applies to *common law claims* outside of a specific statutory scheme abrogating the common law. The deleterious effect would be further exacerbated by permitting such expansive absolute immunity to apply even where the government employer is not a party defendant in the suit. The majority, thus, in effect, extends absolute tort immunity to all government employees even when previous precedent instructs differently.[24] The common law's refusal to apply an *absolute* immunity to all actions of officers

---

[24] We would further contend that the majority additionally fails to deduce that the reasoning it applies here is actually imported from federal precedent unrelated to tort cases

acting in their capacity stemmed from the unpalatable consequence that such employees would be placed "above the law" that would otherwise hold them accountable. *United States v. Lee*, 106 U.S. 196, 220 (1888), *superseded by statute*. We would find, per the Supreme Court of Virginia's recent instruction, that "[t]he decision to adopt a new doctrine applicable to all [such] disputes is a policy decision that is more appropriately left to the legislature." *Under Wild Skies, Inc. v. Nat'l Rifle Assoc. of Am.*, ___ Va. ___, ___ (May 29, 2025). If the Supreme Court wishes to apply such reasoning to these cases in the future, *it* may do so. If the General Assembly wishes to pass a law providing such expansive immunity, *it* too may do so. But this Court should apply existing precedent faithfully until that time. And it is this precedent we would apply here to Drasovean's common law gross negligence claim against the school board employees "in their official capacity," as that caselaw does not support the majority's interpretation for purposes of correcting potential errors.

In sum, we would find that the majority opinion, by analyzing the school board's immunity and not that of its officers, at most constitutes an exemplar advisory opinion on the immunity enjoyed by school boards as the school board is not a party to the case, an "attenuate[d] exercise" per the assignment of error. *Va. State Police v. Elliott*, 48 Va. App. 551, 553 (2006) (quoting *Commonwealth v. Harley*, 256 Va. 216, 219-20 (1998)).

---

against employees in their personal and governmental capacities. The principle applied here is wholly derived from cases involving the *qualified* immunity that applies to deprivation of constitutional rights arising under 42 U.S.C. § 1983. *See Graham*, 473 U.S. at 165 (addressing "official-capacity" in the context of 42 U.S.C. § 1983 suits). And liability under 42 U.S.C. § 1983 is imposed upon "persons" not governmental entities, *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978), does not absolutely absolve *all* actions of officials in their "official capacity," even those in the common law context, *Wahlstrom*, 302 Va. at 221 n.18 (noting the "*Ex Parte Young* fiction" which strips "an officer executing an unconstitutional statute . . . of official capacity" (alteration in original) (quoting John Harrison, *Ex Parte Young*, 60 Stan L. Rev. 989, 995 (2008))). Thus, we would find the majority's interpretation of *Kellam* to be in fact an implied adoption of an enhanced version of the 42 U.S.C. § 1983 standard and error in light of established Virginia precedent.

B. *Current Virginia caselaw permits allegations of gross negligence to proceed against government employees who enjoy derivative sovereign immunity from the governmental entity.*

To resolve this matter, we would have simply applied the existing immunity distinction within Virginia law to these facts. First, we would highlight critical functional differences between sovereign immunity as applied to the *sovereign*, the many arms and agencies of the sovereign, and individual government employees or officials who simply enjoy limited *derivative* immunity based upon their status as an employee of the Commonwealth or its agencies, or its political subdivisions. The sovereign immunity of the Commonwealth is largely enjoyed by only the *Commonwealth* and its agencies, and there is limited authority that its officers, let alone its employees, would be entitled to such expansive immunity protections from suit.[25]

In this case, the circuit court was faced with the issue of whether the employees were sovereignly immune on a plea in bar. The purpose of a plea in bar is "to narrow the litigation by resolving an issue that will determine whether a plaintiff may proceed to trial on a particular cause of action." *Hawthorne v. VanMarter*, 279 Va. 566, 578 (2010). "The moving party carries the burden of proof on that issue of fact." *Tomlin v. McKenzie*, 251 Va. 478, 480 (1996). And "[w]here no evidence is taken in support of the plea, the [circuit] court, and the appellate court upon review, must rely solely upon the pleadings in resolving the issue presented." *Id.* But, like a demurrer, a circuit court must be leery in granting such a motion due to the "dangers of 'short

---

[25] The school board employees conceded at oral argument that both the immunity of the school board employees and the school board itself does not stem from the common law, and instead is bestowed through *Kellam*. *See Ohio Valley Contractors v. Bd. of Educ. of Wetzel Cnty.*, 293 S.E.2d 437, 441 42 (W.Va. 1982) (analyzing English, early federal, and early Virginia authorities to conclude that "County school boards are not entitled to a common law governmental immunity. They were not even a part of 'common law' government."). Hence this discussion is limited to the development of the *derivative* sovereign immunity that applies to government employees in their official capacity.

circuiting' litigation because in doing so, a trial court 'deprives a litigant of his day in court and deprives this Court of an opportunity to review a [more] thoroughly developed record on appeal.'" *Walsh v. Bennett*, 260 Va. 171, 176 (2000) (quoting *Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven Ltd. P'ship*, 253 Va. 93, 95 (1997)). With this standard in mind, we would first review the facts alleging gross negligence and assume those facts as true, then we would have determined whether those facts supported a prima facie case of gross negligence against the school board employees. Since the majority concedes that the facts as pleaded supported a prima facie case for gross negligence against the school board employees, the plea in bar could only have been sustained if any derivative sovereign immunity enjoyed by these particular school board employees was absolute barring even well pleaded gross negligence claims.

Hence, we next must analyze the issue of sovereign immunity that was before the circuit court that the majority clearly finds is akin to "the Commonwealth's immunity," *VEPCO v. Hampton Redevelopment & Hous. Auth.*, 217 Va. 30, 32 (1976), that applies, operating as "absolute" immunity from tort liability,[26] *Jean Moreau & Assocs. v. Health Ctr. Comm'n*, 283 Va. 128, 141 (2012). We contend that sovereign immunity is more constrained as it applies to the individual officer or employee who raises sovereign immunity as a plea in bar. The more constrained derivative immunity is *derivative* in nature, making it less "embracive" of the immunity the sovereign enjoys in its own capacity. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016). In cases involving derivative immunity, suit may lie against officers and

---

[26] However, the Commonwealth's absolute immunity does not apply to all governmental entities in all capacities, *see Hoggard v. City of Richmond*, 172 Va. 145, 149-56 (1939) (noting the difference between actions taken in a ministerial or proprietary capacity and those taken in governmental capacity), nor does it apply to the actions of all individuals acting on behalf of the government. *See Pike v. Hagaman*, 292 Va. 209, 215 (2016) (noting the factors to be considered in determining whether government employees should be able to avail themselves of sovereign immunity).

employees that otherwise would be barred against the sovereign.  *See Friday-Spivey v. Collier*,

268 Va. 384, 387-88 (2004) (noting the Supreme Court of Virginia's "test for determining

whether *an individual working for an immune governmental entity*, such as a county employee

. . . , is entitled to the protection of sovereign immunity" (emphasis added)).  This derivative

immunity centers its protections on acts the sovereign is interested in and the "discretion vested

in [the] government employees" but does not extend to all the employee's actions in all contexts.

*Lohr v. Larsen*, 246 Va. 81, 86-87 (1993).  Thus, there is a difference between primary *absolute*

immunity of the sovereign entity and the more limited *derivative* application of immunity to its

employees and officers, which controls here.[27]

Derivative sovereign tort immunity, which applies to the actions of government

employees, began in Virginia in 1942, where the Supreme Court "extend[ed immunity] to State

agents and employees where they [acted] *legally and within the scope of their employment*."[28]

*Sayers v. Bullar*, 180 Va. 222, 230 (1942) (emphasis added).  In the years that followed, the

Supreme Court of Virginia denoted the bounds of *derivative* sovereign immunity for government

employees in great detail.  For instance, absolute sovereign immunity was found to apply to

employees "who operate at the highest levels of the three branches of government," consistent

---

[27] We decline to further delineate what constitutes "absolute" or "derivative" sovereign immunity beyond noting the development of the law so far, as such analysis is not needed to address Drasovean's assignment of error.

[28] Derivative sovereign immunity is not to be confused with "[q]ualified immunity," *Cromartie v. Billings*, 298 Va. 284, 299-300 (2020), a separate doctrine which immunizes, "government officials performing discretionary functions, . . . from liability for civil damages insofar as their conduct does not violate clearly established *statutory or constitutional rights* of which a reasonable person would have known," *id.* (emphasis added) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity, like absolute immunity, is "an immunity from suit rather than a mere defense to liability."  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 237 (2009)).  However, "qualified immunity is . . . a federal immunity doctrine and does not apply to state tort claims brought against state officials in Virginia courts.  Rather, in appropriate cases, such officials may invoke sovereign immunity" derivatively.  *Viers v. Baker*, 298 Va. 553, 560 n.3 (2020).

with the doctrine's common law roots. *Messina v. Burden*, 228 Va. 301, 309 (1984). As a consequence, "[g]overnors, judges, members of state and local legislative bodies, and other high level governmental officials [are] . . . accorded absolute immunity." *Id.* But immunity for "governmental officials of lesser rank" was to be decided on a "case-by-case basis." *Id.*

Pertinent here for instance, immediately after *Kellam*, the Supreme Court of Virginia initially found that derivative sovereign immunity from the school board did not apply to the *simple negligence* of school board employees, including teachers where students were injured under their supervision. *Crabbe v. Cnty. Sch. Bd. of Northumberland Cnty.*, 209 Va. 356, 360 (1968), *overruled in part*, *Lentz v. Morris*, 236 Va. 78, 82 (1988). This decision was later explicitly affirmed. *Short v. Griffitts*, 220 Va. 53, 56 (1979), *overruled in part*, *Lentz*, 236 Va. at 82. It was then expounded upon in terms of applying to government employees in general. *See James v. Jane*, 221 Va. 43, 51 (1980) ("We make a distinction between the sovereign Commonwealth of Virginia and its employees, and local governmental agencies and their employees. And we have specifically held that the latter do not enjoy governmental immunity and are answerable for their own acts of simple negligence."). "In 1981, the General Assembly enacted the [VTCA] which provides for an express, limited waiver of the Commonwealth's immunity from tort claims." *Canter v. Commonwealth*, 82 Va. App. 593, 602 (2024) (quoting *Rector & Visitors of the Univ. of Va. v. Carter*, 267 Va. 242, 244 (2004)).

The following year, the Supreme Court recognized that *derivative* sovereign immunity applies to the actions of "division superintendent[s]" and "high school principal[s]" as both perform a large number of discretionary and managerial functions in the school." *Banks v. Sellers*, 224 Va. 168, 173 (1982). Over eight years after *Banks*, the Supreme Court abrogated part of the existing precedential scheme by replacing blanket liability for a test, which finds "that an employee of a *county*, which shares the immunity of the State, [is] entitled to the benefits of

sovereign immunity where his activities clearly involved the exercise of judgment and discretion." *Lentz*, 236 Va. at 82 (emphasis added) (quoting *Messina*, 228 Va. at 313). But the *Lentz* Court declined to opine on any effect its decision would have on allegations of *gross negligence* as the preceding standard permitted claims arising from *simple negligence*. *See id.* ("We also expressly overrule *Crabbe* insofar as it addresses *the employee's liability* in that case." (emphasis added)). And the distinction between claims brought against the sovereign and suits brought against its employees, who remain liable for acts of gross negligence, remains the law to this day.[29]

Even reading *Lentz* to its furthest extent, what law applies from it to employees today is merely a test to determine whether government employees may be exposed to liability in cases of *simple negligence*. *Id.* As such, the imposition of liability against such employees for actions constituting *gross negligence* still remains untouched from *Sayers*. *See Colby v. Boyden*, 241 Va. 125, 130 (1991) ("Under Virginia law, where, as here, a defendant's actions are clothed with sovereign immunity, a plaintiff must establish gross negligence in order to prevail."); *Nat'l R.R. Passenger Corp. v. Catlett Volunteer Fire Co.*, 241 Va. 402, 409 n.2 (1991) ("For an individual governmental official or employee, the defense of sovereign immunity is not absolute. He or she may be held liable, but only for gross negligence."). What is more, the Supreme Court of Virginia has even further confirmed that "[a]llegations of gross negligence can pierce through a derivative sovereign-immunity defense asserted by an otherwise immune government employee." *Patterson*, 301 Va. at 197. And this gross negligence can stem from actions taken

---

[29] *Compare Carter*, 267 Va. at 244 ("Absent an express statutory or constitutional provision waiving sovereign immunity, the Commonwealth and its agencies are immune from liability for the tortious acts or omissions of their agents and employees."), *with Linhart v. Lawson*, 261 Va. 30, 35 (2001) (noting in a case arising under Code § 22.1-194, "[g]overnmental employees have always been subject to suit for gross negligence and thus the language in the statute authorizing a suit against employee and school board jointly does no more than recognize that such an employee is amenable to suit").

by the employee "solely in their representative capacity as lawful and proper agents of the State *and not in their own individual right*." *James*, 221 Va. at 51 (emphasis added) (quoting *Sayers*, 180 Va. at 229); *see id.* at 53 ("A state employee who acts wantonly, or in a culpable or grossly negligent manner, is not protected. And neither is the employee who acts beyond the scope of his employment, who exceeds his authority and discretion, and who acts individually."). In other words, this gross negligence liability encompasses actions taken by such employees in their "official capacity." *See, e.g.*, *Burns v. Gagnon*, 283 Va. 657, 677 (2012) (noting that even where common law sovereign immunity and statutory sovereign immunity were invoked under Code § 8.01-220.1:2 by a vice principal of a high school in his official capacity, sovereign immunity did not immunize him from the plaintiff's negligence claim; "[r]ather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence").

Thus, as a core principle, though the "government can function only through its servants, and certain of those servants must enjoy the same immunity in the performance of their discretionary duties as the government enjoys," *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 79 (1983), if these officials or employees are not high level, they are protected from tort claims where "operating within the scope of [their] employment" to perform a governmental action unless the plaintiff well pleads "any claim of gross negligence or intentional misconduct," *Messina*, 228 Va. at 311. Plainly put, "where sovereign immunity is claimed by an agent of the state, rather than by the state as an entity, it will not be extended to acts which constitute a wanton and intentional deviation from the duties the agent has been assigned to undertake." *Tomlin*, 251 Va. at 481. And "[c]onduct outside the scope of the employment is not protected by sovereign immunity." *Id.* a 482.

And in a recent published case as identified by the majority, the Supreme Court of Virginia reaffirmed the status quo distinction between immunity enjoyed by the school board and

immunity enjoyed by employees, holding that though school boards may be immunized from tort claims under *Kellam*, that case does not immunize their *employees* from gross negligence allegations. *See Newport News Sch. Bd. v. Z.M.*, ___ Va. ___, ___ (May 8, 2025). It is true that in *Z.M.* the Supreme Court found that the school board was immunized from suit. *See id.* at ___. But the Supreme Court also qualified its holding that:

> Although sovereign immunity protects the School Board from suit, *the same is not true for the School Board employees* Z.M. has sued. Because the plaintiff alleges that these employees were grossly negligent, the action may proceed against the employees, who are not protected by derivative sovereign immunity in that circumstance.

*Id.* at ___ (emphasis added). Thus, proceedings were permitted to commence against the employees, leaving *Z.M.* as the Supreme Court's latest word on the distinction between absolute and derivative sovereign immunity where school boards and their employees are concerned.[30]

Here, in considering these precedents, we are compelled to conclude that the circuit court erred when granting the plea in bar. Under the current standard, which *Burns* explicitly applied to employees sued in their official capacity, Drasovean's well-pleaded allegations of gross negligence against the school board employees, even while acting as employees in their official capacity, can proceed beyond plea in bar with nothing more. With that standard in mind, we can find no support in the ratio decidendi from *Kellam*, or any later case, suggesting that it applies to the waterfront of cases where official capacity is invoked by the plaintiff and the defendant is an employee and the school board is not a party to the suit. *Compare Kellam*, 202 Va. at 255, *with Messina*, 228 Va. at 309. For our best efforts, where this Court and the Supreme Court of Virginia disagree, the Supreme Court wins. *Commonwealth v. Holland*, ___ Va. ___, ___ (Jan.

---

[30] The majority's holding is actually at odds with *Z.M.*, where the exact distinction between absolute and derivative immunity was plainly demonstrated, with gross negligence allegations against the school board being barred and gross negligence allegations against the school board employees being permitted to proceed. ___ Va. at ___.

6, 2025). Thus, we would avoid the majority's expansive interpretation of *Kellam* as it steers into stare decisis, conflicting with *Burns* and *Z.M.* *Compare Kellam*, 202 Va. at 255, *with Burns*, 283 Va. at 671, *and Z.M.*, ___ Va. at ___. In conclusion, under existing precedent, "[a]llegations of gross negligence can pierce through a derivative sovereign-immunity defense asserted by an otherwise immune government employee," *Patterson*, 301 Va. at 197, and that is exactly what Drasovean has pleaded here.

Under applicable caselaw, there appears to be a question of fact that required resolution as to whether the school board exercised "the degree of control and direction" over the superintendent to immunize their actions or that these employees' actions constitute a "wanton and intentional deviation . . . from [their] assigned duties." *Tomlin*, 251 Va. at 481. However, the resolution of those issues was inappropriate for the circuit court to resolve on plea in bar sans evidence. *James*, 221 Va. at 53. If the General Assembly wishes for suits seeking tort damages for the conduct of officers in their official capacity to be immunized absolutely from this precedent, it can and will do so. Therefore, we would reverse the circuit court's judgment and remand for further proceedings on these grounds. For these reasons, we respectfully dissent.